1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

DISTRICT OF ALASKA

UNITED STATES OF AMERICA,           )   Case No. 3:09-cr-00053-TMB-DMS
                                    )
                  Plaintiff,        )   Anchorage, Alaska
                                    )   Friday, March 25, 2011
            vs.                     )   9:07 o'clock a.m.
                                    )
SIDNEY LAMAR GREENE,                )   **HEARING ON MOTIONS TO SUPPRESS**
                                    )   **(DKTS 313 AND 315)**
                  Defendant.        )
_____     )

**TRANSCRIPT OF PROCEEDINGS**

BEFORE THE HONORABLE DEBORAH M. SMITH
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiff:          DANIEL COOPER, ESQ.
                            Assistant U.S. Attorney
                            U.S. Attorney's Office
                            222 West 7th Avenue, #9
                            Anchorage, Alaska    99513-7567
                            (907) 271-5071

For the Defendant:          PAULA S. DEUTSCH, ESQ.
                            Federal Public Defender Agency,
                            Western District of Washington
                            1601 Fifth Avenue, Suite 700
                            Seattle, Washington   98101
                            (206) 553-1100

                            LINDA ROSE SULLIVAN, ESQ.
                            Federal Public Defender Agency,
                            Western District of Washington
                              (Tacoma)
                            1331 Broadway, Suite 400
                            Tacoma, Washington    98401
                            (253) 593-6710

✿✿✿✿✿✿✿✿✿✿✿✿✿✿✿✿✿✿✿✿✿✿✿✿✿✿✿
**NoDak Rose Transcripts**
*721 North 19th Street*
*Bismarck, North Dakota  58501-4721*
*(701) 255-1601*
*nodak@btinet.net*

```
 1    APPEARANCES (continued):

 2    Court Recorder:              SUZANNETTE DAVID
                                   U.S. District Court
 3                                 222 West 7th Avenue, #4
                                   Anchorage, Alaska   99513
 4                                 (907) 677-6102

 5    Transcription Service:       NODAK ROSE TRANSCRIPTS
                                   721 North 19th Street
 6                                 Bismarck, North Dakota   58501
                                   (701) 255-1054
 7

 8    Proceedings recorded by electronic sound recording.
      Transcript produced by transcription service.
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          ANCHORAGE, ALASKA - FRIDAY, MARCH 25, 2011

2          (Call to Order of the Court at 9:07 a.m.)

3          (All parties present; defendant present telephonically)

4          THE CLERK:  All rise.  Her Honor the Court, the

5   United States District Court for the District of Alaska is now

6   in session, with the Honorable Deborah M. Smith presiding.

7   Please be seated.  Your Honor, we do have Mr. Greene on the

8   line.

9          MS. SULLIVAN:  Good morning, Your Honor.

10         MS. DEUTSCH:  Good morning, Your Honor.

11         THE COURT:  Good morning.

12         MR. COOPER:  Good morning, Your Honor.

13         THE COURT:  Mr. Greene, can you hear me all right?

14         THE DEFENDANT:  Yeah.

15         THE COURT:  Okay.  Okay.  We're here in the matter

16  of U.S. v. Greene, and this is the time set for argument on

17  the motion to suppress and an evidentiary hearing also on the

18  motion to suppress a call and bag, and motion to enlarge the

19  motion to suppress seizure of the call and bag, and a motion

20  to suppress statements made during the search warrant.  Those

21  are at Dockets 313, 591, and 315.  I understand the Government

22  has no opposition to the motion to enlarge the motion to

23  suppress the bag?

24         MR. COOPER:  That's -- that's correct, Your Honor,

25  so we can cover both of them and we don't have to file a

1    separate motion.

2            THE COURT:  Okay.  I'll grant that motion then at

3    591.  Which do you prefer to go forward with initially, the

4    motion to suppress call or the statements made during the

5    search warrant?

6            MS. DEUTSCH:  Your Honor, Mr. Cooper and I briefly

7    spoke before Your Honor took the bench, and we were wondering

8    if it would be all right with Your Honor to cover both matters

9    simultaneously?

10           THE COURT:  That's fine.

11           MS. DEUTSCH:  Because there is a lot of overlap.

12           THE COURT:  Okay.  That's just fine.  Okay.  Either

13   party wish to invoke the witness exclusionary rule?

14           MS. DEUTSCH:  I asked to invoke it before Your Honor

15   took the bench.  I understand that Agent Goeden is the case

16   agent and as such, has a right to be present at counsel table,

17   and Mr. Cooper is going to call Detective Adair first.

18           THE COURT:  Okay.  You'd like to begin?

19           THE MARSHAL:  (Indiscernible - away from

20   microphone.)

21           THE COURT:  Pardon me?

22           THE MARSHAL:  You want me to seal (indiscernible)?

23           THE COURT:  No, we won't -- this will not be sealed.

24   Thank you.

25           MR. COOPER:  Thank you.  Your Honor, the United

1  States calls Detective Allen Adair.

2          THE CLERK:  Please stand before me so I can swear

3  you in.  Raise your right hand.

4      **RANDY ALLEN ADAIR, GOVERNMENT'S WITNESS, SWORN**

5          THE CLERK:  Thank you.  Please have a seat in the

6  witness box.  And for the record, could you please state and

7  spell your full name.

8          THE WITNESS:  Randy Allen Adair.  R-A-N-D-Y

9  A-D-A-I-R.

10          THE COURT:  Thank you.

11          MR. COOPER:  Thank you.

12                      **DIRECT EXAMINATION**

13  BY MR. COOPER:

14  Q    Mr. Adair, by whom are you employed?

15  A    Anchorage Police Department.

16  Q    How long have you been an employee of the Anchorage

17  Police Department?

18  A    Since August of 2004.

19  Q    In 2009, were you involved in an investigation alleging

20  essentially violations of the Travel Act, that is a

21  prostitution enterprise using the Internet?

22  A    I was.

23  Q    About how long had you been involved in that

24  investigation as of March of 2009?

25  A    The preceding year.

1  Q    Okay.  Did you know the principal targets by name in that

2  investigation?

3  A    I did.

4  Q    And who were they?

5  A    Sabil Mujahid and Sidney Greene.

6  Q    How long have you known Mr. Greene -- or of Mr. Greene?

7  A    Since the onset of the investigation.

8  Q    In March of 2009 -- I believe March 26th of 2009, two

9  years ago tomorrow, were you involved in an invest -- excuse

10 me -- an execution of a search warrant at 900 Klevin Street?

11 A    Yes, sir.  I was.

12 Q    And in what capacity?

13 A    Assistance as far as the entry and then processing,

14 searching.

15 Q    Let me go back just for a moment.  During the course of

16 this investigation of Mr. Mujahid and Mr. Greene, which

17 section of the Anchorage Police Department were you assigned

18 to?

19 A    The Vice Unit.

20 Q    And what was Vice Unit's particular responsibilities

21 during the time period leading up to the execution of this

22 warrant and thereafter?  If I could make a pretty broad

23 statement.

24 A    The majority of my life had been spent listening to

25 jailhouse recordings of Mr. Greene and Mr. Mujahid.

1  Q    Are those recordings made by Mr. Mujahid while he was

2  incarcerated to persons outside the jail?

3  A    Yes, sir.  They are.

4  Q    Okay.  Now, on this date, March 26th, 2009, can you tell

5  the Court what happened when you initially arrived on scene,

6  what your role was, and what you did?

7  A    After we initially got entry, I noticed the front door

8  opened and I observed Mr. Greene inside the residence.  There

9  was a small child inside the front living room.  We entered

10 and secured the residence to make sure nobody else was inside

11 the home, and then I took up a position in the kitchen, that

12 was my search area, and began reviewing a cordless telephone

13 that was in that kitchen area.

14 Q    Was Mr. Greene present there at that time?

15 A    He was.

16         MR. COOPER:  Counsel, identification one.  Thank

17 you.

18 BY MR. COOPER:

19 Q    Detective Adair, I've handed you a photograph marked for

20 identification as number one.  Do you recognize that scene?

21 A    I do.

22 Q    What is that scene, if you could tell the Court?

23 A    Mr. Greene's kitchen area.

24 Q    Were you present at or near the time that photograph was

25 taken?

1    A     I'm actually -- a portion of me, my left arm is depicted

2    on the left side of the photograph.

3    Q     And does that photograph fairly and accurately represent

4    the scene as you observed it on that day?

5    A     It does.

6              MR. COOPER:  Government would move the admission of

7    one.

8              MS. DEUTSCH:  I have no objection, Your Honor.

9              THE COURT:  It'll be admitted.

10         (Government's Exhibit 1 admitted)

11   BY MR. COOPER:

12   Q     Could you describe the photograph to the Court?

13   A     In the bottom left corner of the photograph is the

14   kitchen table.  Just mid-left to that -- or the middle portion

15   of the left side of the photograph is my left arm.  Behind me

16   is a dishwasher.  It's kind of an L-shaped kitchen.  From left

17   to right, you've got the sink leading around to the upper-

18   lower cupboards, stove, microwave on the middle right of the

19   photograph.  Mr. Greene is dead center of the photograph

20   wearing tan pants and a blue, brown, and looks like orange and

21   white striped shirt.

22   Q     Can you tell from looking at the photograph at the time

23   that photograph was taken, was -- was Mr. Greene handcuffed?

24   A     He appears to be.  Yes, sir.

25   Q     Now, did -- were you the person that placed the handcuffs

1    on Mr. Greene?

2    A    No, sir.

3    Q    Do you know who did?

4    A    I don't.

5    Q    During -- as I understand your earlier testimony, you had

6    an area to search and that area was the kitchen, is that

7    correct?

8    A    That's correct.

9    Q    Did you in fact perform an area -- a search of the

10   kitchen area?

11   A    I did.

12   Q    And did you find some items that you set aside that you

13   thought might be seized pursuant either to the warrant or the

14   plain-view doctrine because they contained contraband?

15   A    I did.

16   Q    All right.  Can you recall how long Mr. Greene was in

17   cuffs during the time you were there in the kitchen?

18   A    It would be hard to approximate, sir.  I would say I was

19   in the kitchen anywhere from half hour, forty-five minutes to

20   an hour at most.  I specifically recall Mr. Greene being

21   handcuffed at the onset of my contact with him.  At some point

22   in time, I know there was a restroom break given to him.  I

23   know prior to his return, I had taken some knives that were

24   located adjacent to the microwave and closer to the --

25   approximately where Mr. Greene had been sitting, which is the

1    chair that's actually depicted in the lower left corner of the

2    -- Government Exhibit 1, but I moved some knives that were by

3    the trash can that is depicted in the exhibit lower right-hand

4    corner and moved them over to the sink area and up above the

5    cupboard, outside of Mr. Greene's lunge, reach, or grasp.

6    Q    And why did you do that?

7    A    In anticipation that he was going to be released from

8    handcuffs.

9    Q    Was he in fact released from handcuffs when he returned

10   from the bathroom break?

11   A    I don't specifically recall it.  I believe he was, but I

12   don't have a specific recollection of it.

13   Q    Do you recall whether or not Mr. Greene moved at any time

14   around the kitchen to do any of the normal household

15   activities that one would do in a kitchen?

16   A    While I was there searching, he did not.  He remained

17   seated in that chair.  But that was my limited portion and --

18   and contact of the kitchen.

19   Q    While you were there, did agents or officers bring Mr.

20   Greene a copy of the search warrant and affidavit?

21   A    They did.

22   Q    Did you observe that event?

23   A    I did.

24   Q    After they left Mr. Greene, did they leave the warrant

25   there?

1   A    They did.

2   Q    Did Mr. Greene say anything about the warrant and wanting

3   to review anything?

4   A    Yes.  He read through the warrant as he was seated at the

5   table, and I actually helped him thumb through the pages of

6   the warrant, and I turned the pages as he finished reading

7   them.

8   Q    So, he had an opportunity at that time to read the entire

9   thing?

10  A    Yes.

11  Q    Now, you also stated that you were reviewing, I believe,

12  the telephone?  You testified that's your hand looking at

13  telephone numbers and a -- and a telephone that was there?

14  A    That's correct.

15  Q    Did you write down all those telephone numbers?

16  A    I did.

17  Q    While you were there, did any phone there in the

18  apartment ring?

19  A    The phone I was reviewing.

20  Q    Could you tell the Court your observations upon that

21  telephone ringing and what you did?

22  A    It -- I noticed the -- the call -- the Call I.D.

23  displayed Evercom Systems, which was -- I was familiar with

24  Evercom.  That is the -- the system that inmates at the

25  correctional facility use to call outside of the correctional

1  facility.  It was the same number that I had been jotting down

2  on the -- the notes I was taking, and I answered the phone.  I

3  noted a -- there's a -- it's an audible recording, something

4  to the effect of would you like to receive a free call or

5  would you accept a free call from and then the inmate's

6  allowed to record their voice or their name, and it was Sabil

7  was the name on the recording, and I noticed it was Sabil

8  Mujahid.  I recognized his voice from the hours and days of

9  recordings I had listened to up to the search warrant.

10  Q    Did you say anything to Sabil or Mr. Mujahid when he

11  called?

12  A    No.

13  Q    You just hung up?

14  A    I did.

15  Q    And that's the call that ends at the announcement, "Thank

16  you for using Evercom"?

17  A    That's correct.

18  Q    All right.  While you were present with Mr. Greene, did

19  you ask Mr. Greene any questions about his involvement in any

20  prostitution enterprise?

21  A    Not questions that -- per se.  There was a question

22  related to his daughters was the only question that would

23  surround that type of topic of conversation.

24  Q    Okay.  Well, let's go back a little bit.  While you were

25  with Mr. Greene, did he talk to you?

1  A    He did.

2  Q    Could you tell the Court the context and what he had to

3  say to you and how you responded to him?

4  A    I think his first comment was -- I overheard him tell

5  Agent Goeden and Detective Barbosa that his -- his

6  relationship with Mujahid was limited, and I -- his specific

7  words were documented in my report, but his -- it appeared he

8  was trying to distance himself from Mujahid.  And then -- then

9  he goes on to tell me that he's the only family that Mujahid

10 has here in Alaska, which I found interesting.

11 Q    Did you inquire further when he said that Mujahid was

12 your -- was his only -- excuse me -- that he was Mujahid's

13 only relative here in Alaska?

14 A    No.  I didn't -- I didn't ask any -- there was, I think,

15 a series of two questions that I recall asking him

16 specifically.

17 Q    Okay.  And what was the second question?  Let's skip

18 ahead to that.

19 A    The only question was if there was anything in the

20 crawlspace.  Officer Mike Weisel and Officer Allen Rydberg

21 located a -- it was -- it was essentially an -- a attic access

22 that was adjacent to the kitchen, and they located an object

23 up there and they were trying to get a ladder or some type of

24 -- some type of instrument to -- to access the -- the attic

25 there.  And I asked Mr. -- Mr. Greene if there was anything in

1   the attic that was going to hurt either Weisel or Rydberg.

2   Q    And what did he reply?

3   A    He didn't know what was up there.

4   Q    He said he didn't know what was up there.

5   A    Correct.

6   Q    Prior to him -- prior to the officers approaching that --

7   that crawlspace in the attic, could you describe to the Court

8   Mr. Greene's behavior and demeanor?

9   A    He started fidgeting in his seat, just shifting side to

10  side.  As they started to access it, he started shaking his

11  head back and forth, and like a -- a no or a disbelief type of

12  motion.

13  Q    And after they -- did they retrieve an object?

14  A    They did.

15  Q    Could you describe the object for the Court?

16  A    It was like a green plastic portfolio with black nylon on

17  the sides.

18  Q    After they retrieved this object, what did he say, if

19  anything?

20  A    He said, "I, I got to do them people's taxes."

21            MR. COOPER:  Okay.  Counsel, that's two.

22            MS. DEUTSCH:  I have no objection, Your Honor.

23            THE COURT:  Okay.  What is it?

24            MR. COOPER:  It is a series of one, two, three, four

25  -- five photographs I'll hand to Detective Adair.

1   BY MR. COOPER:

2   Q    Detective Adair, I've handed you what's been marked for

3   identification as two.  Just briefly, can you tell the Court

4   what that is?

5   A    Exhibit 2 is a photograph of the -- the attic entryway.

6   It's apparently one of the agents or officers there shining a

7   flashlight or initially opening that attic crawlspace and

8   shining a flashlight up into it.

9   Q    Okay.  So, that's the first page of two.  I apologize.

10  Two is actually five photographs.  What's the second

11  photograph in two?

12  A    The second is a --

13  Q    I'll represent it is a very dark photograph.

14  A    It is.  It -- it's -- it's one of the edges of the

15  portfolio I was describing.  You can see the rubber band that

16  was used to -- to hold the portfolio shut, a small silver tab

17  at one of the corners.  But that's the portfolio as it was

18  located in place prior to it being removed from the -- the

19  attic crawlspace.

20  Q    And number three in that -- or the third photograph in

21  two?

22  A    It's a overall photograph of the actual portfolio after

23  it was removed.  It's the -- it's green translucent and

24  through the -- the portfolio, you can see a Social Security

25  card, what looks to be an Alaska I -- driver's license or

1   identification card, and some type of documents beneath those.

2   Q     And four?

3   A     Four is the cover of the portfolio opened.  It's actually

4   a Social Security card.

5   Q     And it just has some other documents that you can see?

6   A     It does.  Other documents.  I can't make out the name on

7   the card.

8   Q     And five?

9   A     Five is --

10  Q     And please -- please don't say out loud the name on

11  the --

12  A     Yes, sir.

13  Q     -- driver's license.  Thank you.

14  A     Okay.  Yes, sir.  Five is a photograph of a Social

15  Security card and a Alaska identification card.

16        MR. COOPER:  All right.  Thank you.  Government

17  would move the admission of two, Your Honor, the five

18  photographs.

19        MS. DEUTSCH:  No objection, Your Honor.

20        THE COURT:  It'll be admitted.

21     (Government's Exhibit 2 admitted)

22  BY MR. COOPER:

23  Q     Detective Barbo -- or excuse me.  I apologize, Detective.

24  It's kind of automatic for me to say Detective Barbosa.  I

25  really do apologize.  Detective Adair, while you were there,

1    did Mr. Greene offer any other comments to you?  And would it

2    help if I handed you a copy of your report?

3    A    It would, please, sir.

4              MR. COOPER:  Your Honor, if I may.  I'd just

5    approach the witness and hand him a copy of his police report.

6              THE COURT:  Yes.

7              MR. COOPER:  And, Your Honor, that report was

8    attached at 330 -- at Docket 330-2, I believe.  Let me just

9    see for a moment.  It was attached as an exhibit in the record

10   to Mr. Mujahid's original docket at 304, and I believe also in

11   our response, and it is at -- yeah, 330-3.

12             THE COURT:  Mm-hmm (affirmative).

13   BY MR. COOPER:

14   Q    Detective Adair, have you had an opportunity to review

15   your report there?

16   A    I have.

17   Q    Okay.  What else, if anything, did Mr. Greene say to you?

18   A    As I was searching the kitchen, again, he told me that,

19   you know, he was the only family that Mujahid had in Alaska,

20   and although they weren't close, he didn't agree with the way

21   Mujahid treated them.  That was his statement, treated them.

22   Didn't really elaborate on what he was referring to there.  I

23   suspected I knew, but I didn't question him about that.  He

24   also told me that he knew Mujahid was talking too much and

25   that he knew we were listening to them.  From there, I

1    interpret that to be the Evercom phone calls.  And then his

2    last comment was that Mujahid was very selfish, was how he

3    described him, and the only time he called was when he wanted

4    something from Greene.

5    Q    Okay.  Other than the two questions you told the Court

6    that you asked Mr. Greene, did you attempt to elicit any other

7    information?

8    A    I did not.

9    Q    Did you ever advise Mr. Greene that he had the right to

10   remain silent, the so-called Miranda warnings?

11   A    I did not.

12   Q    Did you ever talk to Mr. Greene about his -- that --

13   whether or not he was free to leave if he wanted from the

14   search scene?

15   A    At the onset of our contact with him, I believe it was

16   Detective Barbosa and Agent Goeden spoke with him about he

17   could remain in the residence while we executed the search

18   warrant, or he could leave.  Explained to him that if he were

19   to remain, he would have to stay handcuffed for safety

20   purposes, especially seated in the -- the kitchen area.

21   Q    But did you ever -- did you ever further explain that to

22   him in any way?

23   A    I did not.

24        MR. COOPER:  All right.  Thank you.  I don't have

25   anything further for this detective, Your Honor.

1      THE COURT:  Cross-examination?

2      MS. DEUTSCH:  Yes.

3                   **CROSS-EXAMINATION**

4  BY MS. DEUTSCH:

5  Q    All right.  Detective Adair, you had stated that you were

6  involved in the investigation of Sidney Greene since the prior

7  year, is that right?

8  A    Correct.

9  Q    Prior year was 2008?

10 A    It was.  I believe it actually started the latter part of

11 2007, the very end of 2007 if I'm not mistaken.

12 Q    And was this an investigation involving officers from the

13 Anchorage Police Department as well as FBI?

14 A    It was.  It was a joint effort.

15 Q    Right.  And approximately now many officers and agents

16 were involved in that investigation?

17 A    There was Agent Goeden from the FBI who was our point of

18 contact.  The remainder of the investigation -- or the folks

19 involved in the investigation was myself, Detective Barbosa,

20 Detective Kleinsmith, Detective Von Baltrin (ph), Detective

21 Neer, Detective McKinnon, Officer Mike Weisel, Officer Allen

22 Rydberg to a lesser extent.  That's about all I can remember

23 off the top of my head.  Of course, Detective Sergeant Kathy

24 Lacey.

25 Q    And can you tell us who from the FBI was involved in the

1    investigation of Sidney Greene?

2              MR. COOPER:  Relevance, Your Honor.  Objection.  If

3    we want to get to how many officers were present to support

4    the allegation in the briefing that there were twelve or

5    thirteen officers present, that has some bearing upon perhaps

6    whether or not Mr. Greene's resistence was overcome, but

7    listing all of the officers in the investigation -- involved

8    in the total investigation is not relevant to this hearing.

9    Thank you.

10             THE COURT:  Overruled.

11   A    Agent Goeden was our -- our main point of contact at the

12   FBI.

13   BY MS. DEUTSCH:

14   Q    What about FBI Agent Jacqueline DeCou?  Was she involved

15   also in the investigation of Sidney Greene?

16   A    Her name is familiar.  I don't recall her specific role

17   or how involved or if she was involved.

18   Q    Officer John -- or Special Agent John Eckstein, was he

19   involved in the investigation of Sidney Greene?

20   A    Again, ma'am, his name is familiar to me.  His

21   involvement in this investigation I -- I -- I can't speak to

22   that.

23   Q    And what about, finally, FBI Intelligence Analyst Kelly

24   Woodward?  Was she involved in the investigation of Sidney

25   Greene?

1    A    I'm trying to think if I know Kelly Woodward.  I can't

2    put the name to the face, nor can I speak to her involvement

3    in the case.

4    Q    All right.  Now, was it fair to say -- is it fair to say

5    that at the time you were involved in the investigation of Mr.

6    Greene in the latter part of 2007 or in 2008, you were

7    investigating the possibility of his involvement in

8    prostitution and sex trafficking?

9    A    Correct.

10   Q    Is that right?

11   A    It would be -- he was one of -- well, it was he and Sabil

12   Mujahid.

13   Q    But what you were investigating was the possibility of

14   their involvement, or specifically Mr. Greene's involvement,

15   in sex trafficking and prostitution, is that right?

16   A    Correct.

17   Q    All right.  Now, you were present at the time of the

18   briefing before going to the search, is that correct?

19   A    Yes.

20   Q    All right.  And is it fair to say that all members of the

21   investigation team were also present at the time of the

22   briefing before going to the search warrant execution?

23   A    That would be standard.  I -- I don't specifically recall

24   who was at the briefing, but that would be standard practice

25   unless we had to deviate for some manner.

1   Q     Well, is it your recollection that there were

2   approximately twelve or thirteen officers and agents present

3   at the briefing prior to going to the execution of the search

4   warrant?

5   A     There would be probably six to eight APD and then

6   probably -- yeah, that would -- that would probably be a fair

7   number.

8   Q     And at the time you were present at the briefing, Agent

9   Goeden led the briefing of the team?

10  A     Yes, I believe she and Detective Barbosa both, yes.

11  Q     All right.  And at the time of the briefing, Agent Goeden

12  summarized the affidavit to the search warrant, is that

13  correct?

14  A     I'm sure she did, ma'am.

15  Q     Do you have a recollection of it?

16  A     I -- not specifically.

17  Q     At the time of the briefing, Agent Goeden handed out to

18  all of the members of the team Attachment B which listed those

19  items to be searched for at Mr. Greene's apartment, is that

20  correct?

21  A     I'm sure she did.  I don't specifically recall it, but I

22  know that's -- that's standard.  Yes, ma'am.

23  Q     All right.  And she also had all the officers and agents

24  sign the back of Attachment B before leaving the meeting, is

25  that correct?

1    A    I do recall a federal search warrant where I've had to

2    sign them stating that we've reviewed and read them.  This

3    specific one of Mr. Greene's residence, I don't recall, but I

4    have -- I am familiar with that process.

5    Q    Prior to coming to court to testify today, Detective

6    Adair, did you read the search warrant?

7    A    I did not.

8    Q    Did you read Attachment B?

9    A    I did not.

10   Q    Did you read Attachment A, which is the affidavit to the

11   search warrant?

12   A    I did not.

13   Q    All right.  Did you read your police report --

14   A    I did.

15   Q    -- prior to coming to court?

16   A    Yes, ma'am.  I did.

17   Q    How about that of Detective Barbosa?

18   A    I did not.

19   Q    What else besides reading your police report did you do

20   in terms of preparing for your testimony today?

21   A    I read my report and I spoke with Mr. Cooper, Agent

22   Goeden, and Detective Barbosa.

23   Q    All right.  And did you -- did you read the testimony of

24   Agent Goeden at a prior evidentiary hearing?

25   A    I did not.

1    Q    What about at a prior supplementary evidentiary hearing?

2    Did you read that transcript?

3    A    I did not.

4    Q    Okay.  Agent Goeden -- or excuse me -- Detective Adair,

5    at the time you -- at the time of the briefing, Agent Goeden

6    handed out Attachment B to each of you -- each of the members

7    of the team, right?

8    A    I -- I don't recall, ma'am.

9    Q    At the time of the briefing, Agent Goeden handed out to

10   each of you a list of the victims, including associates and

11   recruiters that you had been investigating, is that right?

12   A    I'm familiar with a list like that.  I don't -- I don't

13   specifically recall on the search warrant with Mr. Greene's

14   residence.  I recall seeing a list on another search warrant

15   related to this, but I can't specifically speak to receiving

16   that during Mr. Greene's search warrant.

17   Q    When you say you recall a list like that in relation to

18   another search warrant, what search warrant was that?

19   A    I believe seeing a list of something related to the --

20   the parties involved at the -- a search warrant that we

21   executed -- if it wasn't at 900 Klevin, then it would have

22   been at Sabil Mujahid's residence.

23   Q    So, at some point in the execution of various search

24   warrants at either Mr. Greene's apartment or Mr. Mujahid's

25   apartment, you did see a list of victims, associates, and

1   recruiters?

2   A     Ma'am, I don't really recall seeing a list.  I -- it was

3   more of passing on information to those that were less

4   familiar with the investigation than we were who actually

5   received that, or who -- who received information on the

6   parties that were involved in a particular investigation, I --

7   I can't speak to, but it was more to educate those that were

8   less familiar with the investigation than -- than we were.

9   Q     Well, when you say those who were less familiar with the

10  investigation than we were, who are -- who are you referring

11  to as those?

12  A     Other people outside of -- members of the Vice Unit --

13  specifically, Detective Barbosa, myself, Detective Kleinsmith,

14  Officer Weisel, Detective Neer, Detective Sergeant Lacey --

15  within the Vice Unit, we were probably the most intimately

16  familiar with all parties that were involved in this

17  particular investigation.  As far as the FBI or other federal

18  entities, I -- I can't speak to their knowledge or how

19  intimately familiar they were with the -- the different key

20  players within the investigation.

21  Q     Who else are you referring to, besides the members of the

22  Vice Unit that you named, who would not be as intimately as

23  familiar with the investigation?

24  A     Anyone other than Detective Goeden, Detective -- or

25  excuse me -- Special Agent Goeden, Detective Sergeant Lacey,

1    Detective Neer, Detective Barbosa, Detective Kleinsmith,

2    myself, Officer Weisel.  Anybody outside of that group, I

3    would consider being less familiar with the role players in

4    this investigation.

5    Q    Well, Detective Adair, at the briefing that you attended

6    prior to going to search Sidney Greene's apartment, were those

7    people who were not so familiar present at the briefing?

8    A    I'm sure.  Yes, ma'am.

9    Q    Do you have a recollection as to those people being

10   present at the briefing?

11   A    There were people that were less familiar.  Specific

12   people, ma'am, I -- I -- I can't lay a name to it.  I know

13   that there was -- there were some evidence custodians, I think

14   Colton Seale who was Agent Goeden's supervisor, there were

15   other members of the Vice Unit that weren't as familiar with

16   the investigation as -- as the core group that I spoke about

17   earlier.  But there were other people that were less familiar

18   with the -- the participants in the investigation.

19   Q    So, the -- the list of victims, recruiters, and

20   associates who the team had investigated, that list was handed

21   out at the -- the briefing to those who were not as familiar

22   with the investigation?

23   A    Ma'am, I -- I -- I can't speak to whether or not the list

24   was handed out.  I don't specifically recall.

25   Q    At some point in time, Detective Adair, you and the other

1    members of the team went to 900 Klevin to Sidney Greene's

2    apartment?

3    A    Yes, ma'am.

4    Q    All right.  And did everyone who attended the briefing go

5    to the execution of the warrant at 900 Klevin?

6    A    I don't recall, ma'am.  It would make sense if you're

7    going to attend a briefing, you're -- you're there because

8    you're going to participate in the execution of a warrant.

9    Whether or not everyone that attended the briefing went to 900

10   Klevin, I can't speak to that.

11   Q    And the officers who went from the briefing to the

12   execution of the search warrant, you went in vehicles, would

13   that be fair to say?

14   A    Yes, ma'am.

15   Q    How many vehicles did you go in?

16   A    I couldn't -- I couldn't tell you, ma'am.

17   Q    Where did you park when you got to the area of 900

18   Klevin?

19   A    I parked on Klevin to the east of Mr. Greene's residence.

20   Q    Where did the other cars park?

21   A    I observed other cars park on Klevin as well.  I wasn't

22   necessarily focused on where other cars were parking.  My

23   focus was directed to the apartment itself.

24   Q    Now, later on, of course, you were inside the apartment

25   at 900 Klevin, is that right?

1    A    That's correct.

2    Q    Did you happen to look out the windows of the apartment?

3    A    Not until it came time to leave and I was looking for a

4    place to pull my vehicle up or get a vehicle up to load in the

5    items of evidence that were seized.

6    Q    And did any of those windows look out over Klevin?

7    A    They do.

8    Q    And so someone from within Mr. Greene's apartment, if

9    they were looking out the window, could see the officers

10   approaching in the vehicles?

11   A    They could.

12   Q    All right.  Now, at some point, the officers exited their

13   vehicles and approached the building, is that right?

14   A    Correct.

15   Q    Now, I believe it was APD Officers Seale -- Seril (ph) --

16   excuse me -- FBI Agent Seale and APD Officer Kleinsmith who

17   first went up to the building.  Would that be correct?

18   A    I don't recall who approached the building first, ma'am.

19   Q    All right.  Now, is it -- is it common practice to have a

20   couple of officers approach the building to make sure that the

21   other officers can enter through a common way?

22   A    I wouldn't -- I wouldn't say that's -- that's common.

23   Somebody at the lead of that -- that formation, you know, may

24   check to make sure the -- if it's a Arctic entry door, that we

25   can gain access or we can circumvent the lock.

1    Q    Now, the -- the APD officers had identifiers on, is that

2    right?

3    A    I believe so, yes.

4    Q    You had jackets that said APD, is that right?

5    A    I can't speak for everybody.  I know I had a police

6    jacket on that said "Police."

7    Q    And did you have your badge displayed, perhaps on a chain

8    in front at the time you approached the building?

9    A    I don't specifically recall if I had mine on a chain.  I

10   know that the front of my jacket has a pull-down badge.  I

11   know it is common to have a badge on a chain at -- at the

12   front of your chest.

13   Q    Well, is it fair to say that all of the APD officers were

14   displaying badges?

15   A    No, that's not fair to say.  I can't -- I can't speak for

16   those.  I would -- I would hope that they would clearly

17   identify themselves, but I can't speak to how they were that

18   particular day.

19   Q    Well, all of the officers -- the APD officers have

20   firearms on, is that right?

21   A    That would be a fair statement.

22   Q    And the FBI agents, they had identifiers such as jackets?

23   A    I'm sure some of them did.  I can't speak to who did and

24   who didn't.

25   Q    And the FBI agents were armed, is that right?

1   A    I would hope so.

2   Q    And the FBI agents had badges displayed?

3   A    I can't speak to that, ma'am.

4   Q    All right.  Now, at some point, the officers went

5   upstairs to Apartment Number 1, right?

6   A    I know it was the upstairs apartment to the left, which

7   is south.

8   Q    All right.  Now, all of the officers went up there at the

9   doorway, is that right?

10  A    I don't recall.  It -- with that many people in the

11  stairway, I don't see -- I don't recall there being that type

12  of gathering in that stairway or in that entry way or hallway.

13  I'm sure, as is standard practice with any warrant, we would

14  have had somebody covering the rear of the residence --

15  Q    Well, Detective --

16  A    -- and on perimeter.

17  Q    Detective Adair, how many officers do you recall were at

18  the doorway prior to Mr. Greene's opening the door?

19  A    Perhaps Detective Barbosa, I don't recall whether Agent

20  Goeden was there, that would have been standard, Detective

21  Kleinsmith, myself, maybe a couple others for entry.  I -- I

22  can't -- I can't speak to a solid number, ma'am.

23  Q    Well, can you -- can you tell us was it more than five

24  who were present at the door before the door was opened by Mr.

25  Greene?

1   A    I would say five to six is -- that's a fair number.

2   That's a safe number to make entry into a residence where

3   there's unknowns.

4   Q    All right.  Now, Mr. Greene opened the door at some

5   point, is that right?

6   A    That's my recollection.

7   Q    And Mr. Greene was cooperative with the officers?

8   A    Yes.  I don't recall any uncooperativeness.

9   Q    And the officers announced themselves as police officers,

10  is that right?

11  A    I believe they did.

12  Q    Did you or any of the other officers have your guns drawn

13  at the time the door was opened by Mr. Greene?

14  A    I don't recall.  I can't really speak for others.  It

15  would not have been uncommon for me to have my weapon drawn

16  when we're executing a search warrant.  I would expect others

17  would have, too.  Any time we're executing a search warrant,

18  that -- the -- the unknowns on the other side of that door,

19  the unknown risk, so I would expect officers had their weapons

20  drawn.

21  Q    Now, the officers announced themselves, is that right, as

22  officers at the time the door was opened?

23            MR. COOPER:  Objection.  Asked and answered, Your

24  Honor.

25            THE COURT:  Sustained.

1  BY MS. DEUTSCH:

2  Q     After the officers announced themselves, Detective Adair,

3  did the officers -- meaning APD officers and FBI agents --

4  move into the apartment?

5  A     Yes.

6  Q     And Detective Barbosa handcuffed Mr. Greene, is that

7  right?

8  A     I don't recall who handcuffed Mr. Greene.

9  Q     One of the officers handcuffed Mr. Greene, is that right?

10  A     That would be fair.

11  Q     And Mr. Greene was moved into the kitchen by one of the

12  officers, is that right?

13  A     I know that's where he ultimately ended.  I don't -- I

14  don't know where -- if that's where he went directly after

15  being handcuffed or where -- I know he did go to the kitchen,

16  yes.

17  Q     And as Mr. Greene was being moved into the kitchen,

18  officers began checking through the apartment, doing what you

19  call a safety check, is that right?

20  A     Well, we want to be sure there's nobody hiding in a

21  closet or no other -- no other people inside the home.

22  Q     Officers were going through the apartment doing a safety

23  check as Mr. Greene was moved to the table, is that right?

24  A     Yes, ma'am.

25  Q     All right.  Approximately how many officers were inside

1    doing the safety check?

2    A    I can't put a number to it, ma'am.  There would have been

3    probably -- well, Agent -- or excuse me -- Detective Barbosa

4    with Mr. Greene in the kitchen area, or living area, it was

5    relatively small room combined.  A minimum of probably three,

6    four clearing the -- the remainder of the apartment.

7    Q    Now, at some point, did the officers who were on the

8    periphery of the building end up in Mr. Greene's apartment?

9    A    I don't know who was on the outside and who ended up

10   inside.  I know we had people searching -- you know, they were

11   divided up.  We had people searching the different areas of

12   the house, but as far as to put a sheer number to it, I can't.

13   I know we weren't -- I wasn't stepping over anyone else --

14   Q    While Mr. Greene was handcuffed, how many agents and APD

15   officers were searching in his apartment?

16   A    I was in the kitchen, there were I think two evidence

17   custodians from the FBI who had set up their processing area

18   in the living room, there may have been one or two other APD

19   or FBI in the living room area searching.  The remainder of

20   the folks would have been in the back bedrooms, bathrooms, in

21   that area.

22   Q    So, is it fair to say that there were approximately

23   twelve or thirteen officers and agents in Mr. Greene's

24   apartment searching?

25   A    No, I don't think that's fair to say at all.  I -- I -- I

1   can't put a number to it, ma'am.  I know we weren't -- we

2   weren't stepping over each other, it wasn't -- that would --

3   twelve or thirteen people in an apartment that size would be

4   extremely chaotic and hard to accomplish anything or do a

5   systematic search.  I can't give you a sheer number.

6   Q    But it --

7   A    I would suspect it would have been a couple of people in

8   each bedroom, perhaps one in the bathroom, I was the sole

9   person in the kitchen, you have the -- the two FBI -- I think

10  it was one or two FBI evidence custodians in the living room,

11  and maybe one, possibly two, searching the living room.

12  Q    And how many bedrooms were there?

13  A    From what I recall, there was two.

14  Q    So, you're describing approximately ten officers in the

15  apartment at any one time involved in the search?

16  A    That would be fair.  I think that would be a max number,

17  but that would be fair.

18  Q    All right.  Now, at some point, Agent Goeden brought the

19  search warrant paperwork to Mr. Greene, is that right?

20  A    At the very beginning, yes.

21  Q    And -- and either Agent Goeden or -- or you or Detective

22  Barbosa told Mr. Greene that you were investigating

23  involvement in sex trafficking or prostitution?

24  A    Something to that effect.  The specific -- I think what

25  was explained to him specifically was detailed in my report or

1    -- I don't recall exactly what they said without reviewing my

2    report.  I thought I captured it in there.

3    Q    Do you have your report with you?

4    A    I do.

5         MS. DEUTSCH:  All right.  Could you -- Your Honor,

6    with the Court's permission, could Detective Adair check his

7    report to refresh his recollection?

8         THE COURT:  Yes, that's fine.

9                        (Pause)

10   A    Under the observations, contact section of my report on

11   page two, the second sentence, you know, I spelled out Agent

12   Goeden explaining that she was investigating human trafficking

13   in addition to conspiracy.

14   BY MS. DEUTSCH:

15   Q    Thank you.  Agent Goeden -- or excuse me -- Detective

16   Adair, during the time Sidney Greene was at the kitchen table

17   with you and perhaps Agent Goeden, he made a comment, you

18   said, about Sabil's business was Sabil's business, something

19   to that effect, or something about Sabil?

20   A    I don't -- I don't recall Sabil's business is Sabil's

21   business.  I can review my report if you like.

22        MS. DEUTSCH:  Could you, plea -- with the Court's

23   permission, could Detective Adair review it?

24        THE COURT:  (No audible reply)

25                        (Pause)

1    A    No, ma'am.  I don't recall anything to that effect.

2    BY MS. DEUTSCH:

3    Q    Were you at the -- at or near the kitchen table during

4    the entire time that Mr. Greene was handcuffed?

5    A    I was.

6    Q    All right.  Did he make any statements about Sabil?

7    A    He did.

8    Q    All right.  And what statements did he make about Sabil

9    while he was handcuffed at the table?

10   A    That Sabil was talking too much and that he, Sidney

11   Greene, knew that we were listening; that Sabil was very

12   selfish, the only time that he called Sidney is when he wanted

13   something; that Sidney, or Mr. Greene, was Mr. Mujahid's only

14   family in Alaska.

15   Q    And these statements, were these the first statements

16   that Mr. Greene made to law enforcement officers during the

17   time of the execution of the search warrant?

18            MR. COOPER:  Objection, foundation.  As far as he

19   knows.

20            THE COURT:  He can testify to what his knowledge is.

21   A    Can you repeat that question?

22   BY MS. DEUTSCH:

23   Q    Were these statements the first statements made by Mr.

24   Greene during the period of time that the officers were

25   executing the search warrant?

1    A    I'm not really sure I understand your question there.  I

2    -- I know that the statements occurred over a period of time.

3    It wasn't -- it was during the -- the course of the search

4    warrant and the course of my -- my stay in his kitchen area.

5    Q    Well, what was the very first statement made by Mr.

6    Greene to law enforcement officers during the execution of the

7    search warrant?

8              MR. COOPER:  Objection, foundation.  Your Honor,

9    she's not established that even if this detective was present

10   at the time first contact was made.  If she could narrow the

11   scope to his individual knowledge, it might be more

12   beneficial.

13             MS. DEUTSCH:  I'll withdraw the question, Your

14   Honor.

15   BY MS. DEUTSCH:

16   Q    To your knowledge, Detective Adair, what was the first

17   statement that Mr. Greene made to law enforcement officers

18   during the execution of the search warrant?

19   A    The first statement that I recall is Mr. Greene trying to

20   distance himself from Mr. Mujahid, stating that he -- he

21   barely knew him.

22   Q    All right.  Now, at the time that Mr. Greene made that

23   statement to law enforcement officers, you were present, is

24   that right?

25   A    Correct.

1   Q    And was Agent Goeden present to the best of your

2   knowledge?

3   A    Yes, ma'am.

4   Q    And how about Detective Barbosa, was he present?

5   A    Yes, ma'am.

6   Q    All right.  And then were other officers present in the

7   apartment searching or participating in the search in some

8   way?

9   A    Correct.

10  Q    And again, Mr. Greene was handcuffed, is that right?

11  A    At the onset, yes.

12  Q    And at the time you -- he made that -- or right after he

13  made that statement, did you read him his Miranda warnings?

14  A    No.

15  Q    At any time while he was making these statements about

16  Sabil Mujahid that you talked about earlier in your testimony,

17  did you read him his Miranda warnings?

18  A    No.

19  Q    Now, you stated that there was another statement that Mr.

20  -- that Mr. Greene made at or about the time the officers

21  accessed a crawlspace or attic area?

22  A    Yes, ma'am.

23  Q    All right.  And -- and you particularly asked him if --

24  about whether or not there would be any problem with accessing

25  the attic area or crawlspace, is that right?

1    A    No.

2    Q    What was it exactly that you asked him about the

3    crawlspace?

4    A    If there was anything that -- that Officer Weisel or

5    Rydberg needed to worry about -- anything up there that was

6    going to hurt them.  It was more of a cautionary -- I -- I

7    didn't want any type of trap being sprung on them or anything

8    up there that would poke, stab, prod them, hurt them.

9    Q    And after the -- after Officer Weisel obtained the bag

10   from the crawlspace, that he brought it out and -- in full

11   view of Mr. Greene, is that right?

12   A    Yes.

13   Q    And that's when Mr. Greene said something about having to

14   do people's taxes?

15   A    He said, I gots to do them people's taxes.

16   Q    All right.  And again, prior to bringing out that bag, no

17   one Mirandized Mr. Greene, is that right?

18   A    Correct.

19          MS. DEUTSCH:  May I have one moment, Your Honor?

20          THE COURT:  Mm-hmm (affirmative).

21                              (Pause)

22   BY MS. DEUTSCH:

23   Q    Now, Detective Adair, there were two bags, a black bag

24   and a green bag, is that right?

25   A    Correct.

1    Q    Which bag was removed from the crawlspace?

2    A    The green.

3    Q    In your report, Your Honor -- or officer -- the Anchorage

4    Police Department report -- you stated that Officer Rydberg

5    removed a black bag from the crawlspace, is that right?

6    A    Can I review my report?

7              MS. DEUTSCH:  With the Court's permission?

8              THE COURT:  Yes.

9                        (Pause)

10   A    Yes, ma'am.  I do -- that's how I did describe it in my

11   report.

12   BY MS. DEUTSCH:

13   Q    All right.  And where -- where is it that the green bag

14   was retrieved from?

15   A    The crawlspace -- or the attic space, ma'am.  I was -- as

16   far as describing it as a green bag, I was referring to the

17   green -- the green sides -- or excuse me -- the black sides of

18   the green portfolio.

19   Q    Well, Detective Adair, is there -- besides the green --

20   and it's a green black -- let me withdraw that.  There's a

21   green and black bag, is that right?  A bag colored green and

22   black?

23   A    It's the portfolio that's identified in Government

24   Exhibit Number 2.

25   Q    And is there another bag which is described as a black

1    bag?

2    A    From my recollection, there was another bag in the

3    residence that was found outside of my presence that was

4    described as a black bag.

5    Q    All right.  And who retrieved that bag?

6    A    I don't recall.

7    Q    So, again, there's two bags, a green and black bag and a

8    black bag, is that right?

9    A    That is my understanding.

10        MS. DEUTSCH:  Your Honor, I have no other questions.

11        THE COURT:  Okay.  Redirect?

12                    **REDIRECT EXAMINATION**

13   BY MR. COOPER:

14   Q    Detective Adair, you have still before you Exhibit Number

15   1, is that correct?

16   A    Yes, sir.  I do.

17   Q    In that exhibit, Mr. Greene is facing towards the living

18   room, is that right?

19   A    That's correct.

20   Q    After that photograph was taken, which direction did he

21   face?

22   A    After the photograph was taken, he was seated in the

23   chair that's depicted in the lower left-hand corner of the

24   photograph.  That chair was facing the doorknob and the

25   microwave that are located on the right side of the

1    photograph.  The particular doorknob is the one that's

2    depicted in the lower right corner of Government Exhibit

3    Number 1.

4    Q    Was his back to the living room area?

5    A    His back and right side was to the living room area.  And

6    actually for a good portion of it, specifically when he was

7    reading the search warrant, his back was to the living room

8    and he was facing -- where I am actually seated, he was facing

9    the dishwasher/sink area for a good portion of the contact

10   with him.

11   Q    Based upon your experience and observation on your

12   presence in the apartment there that day, while he was seated

13   in the kitchen area, would Mr. Greene have been able to see

14   any searchers in the back bedrooms or the bathroom?

15   A    Not at all.

16   Q    How about in the living room?

17   A    Looking over his shoulder or looking back behind him, he

18   could have seen searchers in the living room.

19   Q    And that's where the two -- one or two evidence

20   custodians were, correct?

21   A    Correct.

22          MR. COOPER:  I don't have anything further, Your

23   Honor.

24          THE COURT:  Okay.  You can step down.

25          THE WITNESS:  Thank you.

1   MR. COOPER:  Your Honor, Detective Adair is here on

2  his day off -- pursuant to a subpoena, of course, but if

3  nobody has anything else, we'd like that he be excused so he

4  can return to his family.

5   THE COURT:  Any objection?

6   MS. DEUTSCH:  No, Your Honor.

7   THE COURT:  Thank you.  You're excused.

8   THE WITNESS:  Thank you.

9   MR. COOPER:  Government calls Special Agent Goeden,

10  Your Honor.

11   THE CLERK:  Please raise your right hand.

12   **JOLENE GOEDEN, GOVERNMENT'S WITNESS, SWORN**

13   THE CLERK:  Thank you.  Please have a seat in the

14  witness box.  Please state and spell your full name.

15   THE WITNESS:  Jolene Goeden.  J-O-L-E-N-E

16  G-O-E-D-E-N.

17   THE CLERK:  Thank you.

18   **DIRECT EXAMINATION**

19  BY MR. COOPER:

20  Q    Special Agent Goeden, I apologize in advance if I start

21  calling you detective, but by whom are you employed?

22  A    The FBI.

23  Q    In what capacity?

24  A    As an agent.

25  Q    How long have you been a Special Agent with the FBI?

1    A    Approximately seven years.

2    Q    In the course of the performance of your duties as a

3    Special Agent with the FBI, have you been involved in the

4    investigation of specifically the Travel Act and prostitution

5    enterprises, racketeering, involving Sabil Mujahid and Sidney

6    Greene?

7    A    Yes, I have.

8    Q    When was this matter first brought to your attention

9    generally, if you recall?

10   A    Early 2008, I believe, is when I became involved.

11   Q    Okay.  In March of 2009, were you involved in applying

12   for and obtaining a warrant to search 900 Klevin Street,

13   Apartment Number 1?

14   A    Yes, I was.

15            MR. COOPER:  Your Honor, I think that that has been

16   marked several times in this case, but it may be helpful to

17   have it marked yet once again.  I think the defense also has

18   it marked and ready to go, and I seem to have misplaced my

19   copy.

20            MS. DEUTSCH:  Dan, do you want to use ours?

21            MR. COOPER:  Sure.

22            MS. DEUTSCH:  Okay.

23            MR. COOPER:  It's marked as -- oh, for

24   identification as Defendant's A.

25   BY MR. COOPER:

1   Q    Do you recognize that?

2   A    Yes, I do.

3   Q    And what is that?

4   A    This --

5   Q    By number, please.

6   A    It's Defendant's Exhibit A and this is a search warrant

7   for 900 South Klevin Street, Apartment A.

8   Q    And the search warrant number, please?

9   A    3:09-MJ-00048.

10  Q    And what was the date that warrant was executed?

11  A    March 26th.

12  Q    Of which year?

13  A    Of 2009.

14  Q    All right.  Thank you.  Did you -- were you the case

15  agent or lead agent on the application and then the execution

16  of this warrant?

17  A    Yes.

18  Q    In fact, you're the affiant on the warrant, correct?

19  A    Yes, I am.

20  Q    All right.  Did you hold a briefing prior to the

21  execution of the warrant?

22  A    Yes, we did.

23  Q    Where was the briefing held?

24  A    Anchorage Police Department, Vice Unit.

25  Q    Do you recall how many officers and agents were there

1    present?

2    A    Approximately twelve.  We've talked about that.

3    Approximately twelve.  I'd have to look at the -- the list.

4    Q    Can we agree for the purposes of this hearing, that there

5    were between twelve and thirteen agents, officers, and

6    evidence custodians that were present at the briefing and then

7    at the execution of the warrant?

8    A    Yes.

9    Q    Now, with respect to this warrant application and the

10   execution of this warrant, were there any other warrants being

11   executed at the same time and in the general -- same general

12   location?

13   A    Yes.  We also had search warrants for vehicles at Sidney

14   Greene's apartment as well at Klevin Street.

15   Q    How many vehicles?

16   A    I believe there were two.

17   Q    So, the twelve or thirteen officers were going to be

18   executing how many warrants?

19   A    Three.

20   Q    Including the apartment and the two vehicles.

21   A    Yes.

22   Q    At the search warrant scene for the FBI, do you, when

23   possible, have evidence custodians come to the scene?

24   A    Yes.

25   Q    What is their purpose?

1  A    Their purpose is to -- we like to use the computer system

2  when we can, so they enter all of the evidence that we're

3  seizing into the computer, and also help keep track of who's

4  there, when people leave, those types of things;

5  administrative matters.

6  Q    Are they armed?

7  A    No, they are not.

8  Q    Do they have FBI raid jackets though?

9  A    I believe they do.

10 Q    They have -- do they have ones that say FBI evidence

11 team, something like that?

12 A    We do -- if they're part of the evidence response team,

13 yes, we do have gear that says that.

14 Q    The FBI ERT?

15 A    Yes.

16 Q    That's how -- at the time this warrant was executed, who

17 headed up the FBI ERT, do you recall?

18 A    I -- I was the team leader and Colton Seale was the

19 supervisor.

20 Q    Now, at the execution of the warrant at 900 Klevin

21 Street, the apartment, that day, were you present?

22 A    Yes, I was.

23 Q    In the group that approached the door, what was your

24 position, if you recall?

25 A    I was in the stairwell.  I don't -- I was not at the

1    front.  I don't believe that I was at the front or like the

2    first person outside the door, but I was -- I was near the

3    front.

4    Q    Do you recall whether or not the agents and officers

5    executing the warrant at 900 Klevin Street that day had their

6    weapons drawn?  As they --

7    A    As they approached?

8    Q    -- as they approached and made contact with the door and

9    the initial -- whoever opens the door.

10   A    I cannot speak to every agent.  I can speak to what is

11   standard and what I did.

12   Q    Right.  What did you do?

13   A    As I'm approaching the door, it's very standard to have

14   my hand on my gun, and as we go in the door and as we're

15   clearing the residence, the gun is out.  It's not up, but it's

16   -- it's out, yes.

17   Q    In -- in what they call the guard position or --

18   A    Yes.

19   Q    -- the take position?  Why do officers and agents do that

20   when they go into an apartment?

21   A    For safety purposes.  It's a -- it takes a lot longer to

22   pull your gun from the holster if you need it, as opposed to

23   having it up and just pulling it out.

24   Q    Once the -- once the apartment or the place to be

25   searched is cleared, what did you do with your weapon?

1    A    I holstered it.

2    Q    On that day, were you wearing a hip holster?

3    A    Yes.

4    Q    Okay.  Did you make contact with Sidney Greene relatively

5    quickly after entry was made into the apartment?

6    A    Yes.

7    Q    Who else was when you when you made contact with Mr.

8    Greene?

9    A    Detective Barbosa.

10   Q    What did Mr. Greene look like when you first approached

11   him?

12   A    Umm --

13   Q    Just -- just describe his demeanor and whether or not he

14   was restrained at that time.

15   A    When I first talked with him when I walked in the door

16   and -- and began talking with him, he was in handcuffs.  He

17   was being cooperative with us, he was not fighting or anything

18   like that.

19   Q    Who was present when you first saw him and -- and -- and

20   talked with him?

21   A    Who was -- I'm --

22   Q    Yeah, besides --

23   A    -- who was present with me?

24   Q    Yes.

25   A    Detective Barbosa.

1    Q    What, if anything, did you do with Mr. Greene after you

2    first made contact with him?

3    A    We had Mr. Greene sit at the table and Detective Barbosa

4    and I sat with him with a copy of the search warrant and the

5    Attachment B.

6    Q    At any time during the execution of the search warrant at

7    900 Klevin Street, did you advise Mr. Greene that he had

8    rights pursuant to Arizona v. Miranda, the so-called Miranda?

9    A    No, I did not.

10   Q    And why not?

11   A    Because he was not under arrest and we had given him the

12   option to leave --

13   Q    Could you just --

14   A    -- the apartment.

15   Q    Could you relate to the Court, please, what it was that

16   you or Detective Barbosa related to Mr. Greene about what he

17   could or could not do that day?

18   A    Sure.  I -- I instructed Mr. Greene that they -- he had

19   essentially two options.  He could leave the apartment while

20   we conducted the search warrant and then we would let him know

21   when he could return to the apartment, or -- when we were

22   finished with the search -- or he could remain in the

23   apartment while we did the search, but if he were to remain in

24   the apartment, there were restrictions.  He would not be able

25   to just walk around the apartment, and that was for offer --

1  officer safety reasons.

2  Q    Did you tell him anything about he would have to remain

3  in restraints or handcuffs while he stayed in the apartment?

4  A    I -- I did -- I don't recall the specific words that we

5  used, but he would -- I would have told him and Detective

6  Barbosa that he would have to remain in handcuffs initially,

7  and that again was for officer safety purposes, but that at

8  some point, he would be able to get out of handcuffs, but that

9  also he -- we asked him to be cooperative with us.

10 Q    Did he -- did he say -- what he -- what was his decision

11 as he told you at that time?

12 A    Sure.  He chose to stay in the apartment.

13 Q    Did he give you a reason why he wanted to stay there?

14 A    I believe in part it was because his daughter was there.

15 Q    Did you and Mr. Greene have a discussion about his

16 daughter and her safety?

17 A    We did.

18 Q    Would you tell the Court what that discussion was?

19 A    I don't recall how old the child was that was in the

20 house, but we did have a discussion about where she was going

21 to go during the course of the search warrant and an officer

22 -- Office of Child Services social worker was also coming to

23 the residence.  They wanted to interview the child, and so we

24 coordinated with Mr. Greene that the child would be taken to

25 OCS to be interviewed, and then the child's mother was going

1    to pick the child up.  And -- and that conversation -- those

2    phone calls were made with the child's mother in Mr. Greene's

3    presence.

4    Q    Okay.  Thank you.  With -- did he continue to exercise

5    his choice to stay there?

6    A    Yes, he did.

7    Q    Do you recall a time when he was out of cuffs?

8    A    I do.

9    Q    Could you tell the Court that, please?

10   A    I do recall at some point, I don't have a time -- a

11   specific time -- Mr. Greene asked to use the restroom, and he

12   was taken to the restroom and he was not in handcuffs,

13   obviously, when he used the restroom.  And then I believe to

14   the best of my knowledge, he remained out of cuffs after

15   returning from the restroom.

16              MR. COOPER:  Thank you.  Your Honor, could we take a

17   quick break?

18              THE COURT:  Yes.

19              MR. COOPER:  Thank you.  Why don't we go off -- five

20   minutes?

21              THE COURT:  That would be fine.

22              MR. COOPER:  Thank you very much.

23              MS. DEUTSCH:  Your Honor, before we leave the

24   courtroom, could the Court please inquire if Mr. Greene is

25   able to hear all of the testimony and the -- the questioning?

1       THE COURT:  Certainly.  Mr. Greene, are you able to

2   hear everything that's gone on?

3       THE DEFENDANT:  Yes, yes.

4       THE COURT:  Okay.

5       MS. DEUTSCH:  Thank you.

6       MR. COOPER:  Thank you, Your Honor.  Five minutes?

7       THE COURT:  Five-minute break.

8       THE CLERK:  All rise.  Court stands in recess for

9   five minutes.

10      MR. COOPER:  Been very seldom that I've actually put

11  a judge to sleep on the bench.

12      MS. DEUTSCH:  Not as bad as my putting the judge to

13  sleep.

14      MR. COOPER:  I'll be right back.

15      THE CLERK:  Mr. Greene, we're going to take a five-

16  minute break, so you can take a five-minute break.

17      THE DEFENDANT:  Okay.

18      MS. DEUTSCH:  Are you putting Mr. Greene on hold

19  or what?

20      THE CLERK:  I can't from here.  He's just going to

21  have to --

22      MS. DEUTSCH:  All right.  Can we go and use the

23  restroom and --

24      THE CLERK:  Yes.

25      MS. DEUTSCH:  -- without --

1          THE CLERK:  Mm-hmm (affirmative).

2          MS. DEUTSCH:  -- going through security?  Oh, we

3   just have to walk through the gate?

4          THE CLERK:  Yeah, you just have to walk through.

5          MS. DEUTSCH:  All right.

6       (Recess at 10:14 a.m., until 10:23 a.m.)

7          THE CLERK:  Okay.  We're on record.

8                  (Pause - side conversation)

9          THE CLERK:  All rise.  Her Honor the Court, this

10  United States District Court is again in session.  Please be

11  seated.

12         THE COURT:  I think the agent has just testified

13  that Mr. Greene was not in cuffs and had returned from the

14  bathroom earlier?

15         MR. COOPER:  Yes.  Thank you.

16              **DIRECT EXAMINATION CONTINUED**

17  BY MR. COOPER:

18  Q    Just to clarify, do you remember how far into the search

19  that was in terms of time, roughly?

20  A    In terms of time, no.

21         MR. COOPER:  Okay.  All right.  Now, in the course

22  of this search, there are two things that are kind of an

23  issue, search of a -- the seizure of a black bag and the

24  seizure of a green pouch or a green bag, okay?  Now, I'm going

25  to show you what's been marked, if I can.  I'm going to mark

1   this as Government Exhibit Number 3, counsel.  And I -- thank

2   you.

3        (Government's Exhibit 3 marked for identification)

4   BY MR. COOPER:

5   Q    Ask if you recognize Exhibit 3 which is comprised of

6   three photographs.

7   A    And would you tell us what three is, please?

8   Q    Government Exhibit 3 is a black bag that contains

9   numerous documents and paperwork.

10  A    Now, do you know whose -- do you recall who seized that

11  and where it was located?

12  Q    I believe it was seized out of the -- the closet area in

13  the kitchen, and I do not recall who found the actual bag.

14  A    Okay.  Now, do you remember, Agent Goeden, testifying

15  back on -- in November about the same contents of this black

16  bag?

17  Q    I do.

18            MR. COOPER:  Okay.  Your Honor, if I admit -- rather

19  than go through everything that was in it, which we did --

20  when Mr. Nugent, he filed his motion to suppress this bag, it

21  was at Docket 304.  I think the hearing was on November 10th.

22            THE COURT:  Mm-hmm (affirmative).

23            MR. COOPER:  The contents of that bag at that time

24  were marked as Exhibit Number 3.  I'm going to mark them as

25  Exhibit Number 4 here.  I provided Ms. Deutsch and Ms.

1  Sullivan with a complete copy of it.  For the record, it

2  contains documents previously provided in discovery as 826

3  through 1020.  If I may approach the witness --

4        THE COURT:  Yes.

5        MR. COOPER:  -- and show her four?

6     (Government's Exhibit 4 marked for identification)

7  BY MR. COOPER:

8  Q    Special Agent Goeden, do -- you now have before you

9  identification number four.  Do you recognize that?

10 A    I do.

11 Q    And what are those documents?

12 A    These are copies of the items that were found in the

13 black bag.

14 Q    Okay.  And that's in identification number three?

15 A    Yes.

16 Q    And for the record, could you read in from the bottom

17 right-hand corner the beginning and ending Bates number or

18 identification number?

19 A    Sure.  The beginning number is 826 and the ending number

20 is 1020.

21        MR. COOPER:  Thank you.  Your Honor, the Government

22 moves the admission of three and four.

23        THE COURT:  Any objection?

24        MS. DEUTSCH:  No, Your Honor.

25        THE COURT:  They'll be admitted.

1       (Government's Exhibits 3 and 4 admitted)

2   BY MR. COOPER:

3   Q    Now, you also have before you Defendant's Identification

4   A.   Is there an attachment to Identification A that describes

5   the items to be seized?

6   A    Yes, Attachment A -- or I'm sorry, Attachment B.

7   Q    With respect to Exhibits 3 and 4, under which paragraphs

8   of Attachment B did you seize those -- those -- that item?

9   A    I think the contents would fall under a couple of

10  different paragraphs.

11  Q    Could you tell the Court, please?

12  A    Sure.  In paragraph A, there are items in here such as

13  identification cards and other -- give me just a moment.  I

14  want to figure out what paragraphs I'm referring to here.

15                          (Pause)

16  Okay.  Item -- or paragraph A refers to identification

17  documents and paragraph B refers to financial -- financial

18  type records, and that -- that would apply also to some of the

19  documents here, my rational for seizing some of these

20  documents.  And if you give me just a moment, I think those

21  are the two primary paragraphs.

22                          (Pause)

23  As well as paragraph A where it refers to evidence of

24  prostitutes, recruiters, employees, or other persons

25  associated with the business, and that would include

1    identification cards and correspondence paperwork, and other

2    belongings.

3    Q    Right.  So, the over-arching paragraph under which you

4    seized them was the introductory paragraph, and then

5    specifically by way of example in paragraphs one and two, is

6    that correct?

7    A    Correct.

8              MR. COOPER:  All right.  Thank you.  If I may

9    approach the bench, Your Honor, and retrieve --

10             THE COURT:  Yes.  What are you retrieving?  Not

11   giving --

12             MR. COOPER:  I'm -- I'm retrieving -- I'll hand it

13   up in just a moment.

14      (Government's Exhibit 5 marked for identification)

15   BY MR. COOPER:

16   Q    Special Agent Goeden, I've handed you Exhibit 2.  Showing

17   counsel Identification 5 --

18                          (Pause)

19   -- and handing you Identification 5.  Can you -- do you

20   recognize Exhibit Number 2?

21   A    I do.

22   Q    And what is Exhibit Number 2?

23   A    These are a series of photographs that show the -- the

24   attic crawlspace area, just -- near the kitchen, which is

25   where the -- the green portfolio was found.

1   Q    Okay.  Turning your attention to the last page of Exhibit

2   Number 2, do you see an Alaska identification card there?

3   A    Yes, I do.

4   Q    And without saying the name of the person, is that a

5   person who at the time was a person that was on the list that

6   was given to the agents during the briefing?

7   A    Yes.

8   Q    Do you recognize that person?

9   A    Yes, I do.

10  Q    Is that Jane Doe 7 --

11  A    Yes.

12  Q    -- that's named in the Indictment in this case?

13  A    Yes.

14  Q    Thank you.  Now, turning your attention to Identification

15  Number 5, do you recognize Identification Number 5?

16  A    Yes, I do.

17  Q    Would you tell the Court what Identification 5 is?

18  A    These are the documents -- or copies of the documents and

19  the items that were found within that green portfolio.

20  Q    All right.  Could you, for this record, tell the Court,

21  for instance -- well, not for instance.  I think we're going

22  to have to go through it just to establish what's in there

23  unless defense counsel will let the documents speak for

24  itself.  But what was in that green folder?

25  A    There were a number of items.  Tax documents, there was

1    -- there were documents referring to a -- a business, a resume

2    of Sabil Mujahid, and the business is -- one of the businesses

3    list Alaska Communication Systems, ACS, another one of the

4    businesses refers to escorting and dating, and I don't recall

5    if there's a specific business name with that business.  And

6    then it goes through a number of -- they appear to be scripts

7    for that escort business; how to answer the phone, what to say

8    for phone calls, questions to ask clients, and then --

9    Q    Okay.  Too many --

10   A    -- Northern Exposure.  I apologize.  That was the name of

11   the -- the escorting service.

12   Q    And that's part of SWO three dash leading zeroes five

13   three one?  Could you tell the Court what that is?

14   A    Five three one is an escort questionnaire.

15   Q    And then starting at 533?

16   A    That's a Northern Exposure Escorting and Dating Service,

17   Indemnification and Non-Disclosure Agreement.

18   Q    Five thirty-five?

19   A    It is a lease rental agreement for Mota (ph) Properties

20   on be -- and it lists Sidney Greene as the -- the owner.

21   Q    And 536?

22   A    This is a custody judgment between Sidney Greene and

23   another female.

24   Q    Right.  And then 537 through 541, can you tell what those

25   are?

1   A     Sure.  Five thirty-seven and -- through 541 are a series

2   of U.S. Treasury checks where the name -- not all of them, but

3   some of them have the name crossed out or -- or   whited out

4   on the check.

5   Q     And then at 542?

6   A     Department of Treasury Financial Management Service.

7   This would be a document in reference to child support.

8   Q     And then --

9   A     Again with the -- the name crossed off or whited out.

10  Q     -- 543?

11  A     An IRS form, again, with the name blocked off of it.

12  Q     And that goes through page 548, correct?

13  A     Yes, that's correct.

14  Q     Starting at 549, can you tell us what -- what those are?

15  A     These are handwritten notes listing individuals with

16  names, dates of birth, and Social Security numbers; that's

17  549.  Five fifty is similar to that, it also includes bank

18  account information and social -- or appears to be a telephone

19  number.  Five fifty-one, again, name, date of birth --

20  handwritten notes with a name, date of birth --

21  Q     Five fifty-two?

22  A     This appears to be a pay stub for Sidney Greene for a

23  period -- for a particular time period.  It does not list the

24  employer that I can see.

25  Q     And 553?

1    A    Five fifty-three is a birth certificate for Mr. Greene.

2    Q    And 554.

3    A    Five fifty-four is the State of Alaska identification

4    card that we spoke of earlier; I believe it's Jane Doe 7.

5              MR. COOPER:  Thank you.  I have nothing further.

6              THE COURT:  Cross-examination.

7                        **CROSS-EXAMINATION**

8    BY MS. DEUTSCH:

9    Q    Agent Goeden, I want to do -- first talk about -- a

10   little bit about the investigation.  You were involved in the

11   investigation of Sidney Greene pretty much from the beginning,

12   is that right?

13   A    Correct.

14   Q    And the investigation of Sidney Greene began actually

15   about June of 2008, is that right?

16   A    That sounds right.  I had to finish up another trial

17   earlier that year and it was after that, so late spring, early

18   summer sounds correct.

19   Q    All right.  Now, to the best of your knowledge, about how

20   many officers and agents were involved in investigating Sidney

21   Greene in regard to sex trafficking?

22   A    There were several people involved in the -- in -- in the

23   investigation.  Detective Barbosa and I were the primary

24   people involved.  We had several people involved for different

25   areas, and it -- and I want to clarify it was not just for sex

1    trafficking, but that were involved in the investigation.

2    Q    And when you say it was not just for sex trafficking,

3    what else would it have been --

4    A    We --

5    Q    -- in regard to Sidney Greene?

6    A    We were also looking at Travel Act as well as sex

7    trafficking.

8    Q    So, those were the two areas that you and your task force

9    were primarily concerned with in the investigation of Sidney

10   Greene, traveling -- Travel Act and sex trafficking?

11   A    At that point, yes.

12   Q    All right.  Now, during the course of your -- and -- and

13   let me withdraw that.  Your investigation of Sidney Greene for

14   the Travel Act and sex trafficking violations lasted for

15   approximately eight months, is that right?

16   A    I would say that it's ongoing, so I wouldn't say it just

17   lasted eight months.  In terms of up to the point of when the

18   search warrant was executed?

19   Q    Correct.

20   A    Yes.

21   Q    All right.  And during that period of time, did you and

22   your team of investigators meet to discuss the process and the

23   progress of the investigation?

24   A    Sure.  The -- the -- the -- the core folks, Detective

25   Barbosa and I, met on a regular basis.

1   Q    Did any other officers meet with you during the periods

2   of time you were doing the investigation?

3   A    Sure.  Absolutely.  At times we were meeting with them.

4   Q    And during the time of the investigation, you had pretty

5   much nailed down the names of some of the people whom you

6   believed to be victims of the sex trafficking, is that right?

7   A    Yes.  We'd identified some of the individuals.

8   Q    And you also had photographs of some of the individuals

9   whom you believed to be victims of the sex trafficking?

10  A    Correct.

11  Q    And did you share this information in regard to the names

12  of victims and the photographs of victims with other members

13  who were investigating Mr. Greene?

14  A    Yes.

15  Q    And as you progressed in your investigation, were you

16  making notes about whom you spoke with in regard to the sex

17  trafficking investigation?

18  A    In terms of other law enforcement that I had talked with?

19  Q    Well, let me withdraw that.  As your investigation

20  progressed, did you make notes as to the victims whom you

21  identified and the recruiters whom you identified and the

22  associates whom you identified in regard to sex trafficking?

23  A    Sure.  I'm sure that I had notes of that manner.

24  Q    All right.  And again, you shared all that information

25  with other officers involved, is that right?

1    A    Yes.  At one point or another, I would have -- we were --

2    I talked with several officers on this.

3    Q    And you had a -- or Detective Barbosa had a confidential

4    informant who was giving information about Mr. Mujahid and Mr.

5    Greene?

6    A    I believe so, yes.

7    Q    And this was a confidential informant who had said she

8    herself had been associated with Mr. Greene as a prostitute?

9    A    I believe so.  I would have to refresh my memory on -- on

10   that since it was not a confidential informant that I was -- I

11   was specifically involved in -- in working with.

12   Q    Did Detective Barbosa ever talk to you about any

13   confidential informants that he had who was giving information

14   about Mr. Greene?

15   A    He did.  He did.  And I'm aware of who you're speaking

16   of, I just don't recall all the specifics about that

17   particular confidential informant.

18   Q    All right.  Now, Agent Goeden, at some time, you decided

19   or someone in law enforcement decided to move ahead and apply

20   for a search warrant of Mr. Greene's apartment?

21   A    Yes.

22   Q    All right.  And was that partly your decision?

23   A    Yes.

24   Q    And you drew up the search warrant, is that right?

25   A    Correct, with Detective Barbosa.

1    Q    And you and Detective Barbosa drew up Attachment A, the

2    affidavit?

3    A    Yes.

4    Q    And the two of you also drew up Attachment B, is that

5    right?

6    A    Correct.

7    Q    All right.  Now, prior to executing the search warrant,

8    you had what's called an operational plan?

9    A    Yes.

10   Q    And in that plan -- that plan involved deciding which

11   assignments to give to which person who was executing the

12   search warrant?

13   A    Correct.

14   Q    And you also decided in that plan exactly which law

15   enforcement officers and FBI agents would be involved?

16   A    Correct.

17   Q    Now, the briefing took place on the day of the execution

18   of the search warrant, which was March 26th, '09?

19   A    Yes.

20   Q    And at that meeting, all of the officers involved in the

21   investigation of Mr. Greene in regard to sex trafficking were

22   present, is that right?

23   A    I can't say that everyone that was involved in the

24   investigation was present; that I can't say.

25   Q    Well, there were about -- would it be fair to say there

1    were about twelve or thirteen officers and agents present at

2    the investigation briefing --

3    A    Yes.

4    Q    -- or at the briefing?

5    A    Yes, but not everyone involved in the briefing had been

6    involved in the investigation.

7    Q    All right.  Now, would part of the briefing purpose be to

8    bring up to speed those people who were not real involved in

9    the investigation?

10   A    Yes.

11   Q    All right.  Now, at the -- at the briefing, you

12   summarized Attachment A, the affidavit?

13   A    Correct.

14   Q    And you read a majority of Attachment B?

15   A    Correct.

16   Q    All right.  And you handed out Attachment B to each of

17   the officers and FBI agents who were at the briefing?

18   A    Correct, and Attachment A, I also had copies of that

19   there for the individuals who were not as familiar, so that

20   they could review the Attachment A as well.

21   Q    And did you see whether or not they in fact reviewed

22   Attachment A?

23   A    I don't recall people picking them up and looking at

24   them.  I wasn't standing over their shoulder to make sure that

25   they --

1  Q    Yeah.

2  A    -- read them, but yes.

3  Q    All right.  Now, you also had a list of victims whom you

4  had identified during the course of your investigation, is

5  that right?

6  A    Correct.

7  Q    And you handed out the list of victims to each and every

8  one of the persons who was present at the briefing?

9  A    I don't re -- recall if I handed them specifically to

10 each person.  They would have been on the table for individual

11 -- for people to pick up along with some of the other items,

12 and I certainly referred to that list during the briefing.

13 Q    Did you talk about who -- the names of the -- the

14 individuals on that list?

15 A    Yes, I did talk about those names.

16 Q    All right.  Now, was the purpose of your handing out

17 Attachment B to each of these officers and FBI agents so that

18 they could compare those items that they were searching for or

19 finding against what was in Attachment B?

20 A    Yes, and also to just familiarize -- familiarize them

21 with names so when they're searching if they would see a name,

22 it would ring a bell and that they would look twice at it.

23 Q    Was it your goal that the -- what the officers

24 confiscated or took from the site at Klevin Street fit within

25 the -- the warrant itself?

1    A     Oh, absolutely.

2    Q     All right.  So, when the officers left the briefing, they

3    each had Attachment B, they each had a list of those

4    individuals whom you had identified as connected to the sex

5    trafficking investigation of Mr. Greene.

6    A     They had Attachment B.  I cannot say for sure that every

7    individual who walked out of there had that list of names.

8    Q     But it had been provided as -- right?

9    A     It had been provided and it was also -- I had it with me

10   at the search site.

11   Q     All right.  Now, in going to the -- the -- one moment,

12   Agent.  Now, you had each of the agents sign the back of -- of

13   Attachment B before they left the meeting, is that right?

14   A     Correct.

15   Q     All right.  And would that be to indicate that they had

16   familiarized themselves with what it was they were to look for

17   in the search at Mr. Greene's apartment?

18   A     Correct.

19   Q     All right.  Now, at South Klevin -- were you involved in

20   the approach to Mr. Greene's building at Klevin Street?

21   A     Yes, I was.

22   Q     Okay.  And how many officers went inside the building and

23   how many officers or agents remained outside?

24   A     On the initial approach?

25   Q     Yes.

1   A    I can't give you an exact number.  I would an -- I recall

2   though that there were probably six to seven who went up into

3   the residence and the rest remained down below, and we did

4   also have -- not everyone that was there was a law enforcement

5   officer, so they would not have approached the -- the

6   residence.  For example, our evidence custodians would not

7   have gone into the residence initially.

8   Q    But the evidence custodians, one they -- once they went

9   into the residence, were identified as FBI personnel, weren't

10  they?

11  A    Once the residence was secured and the evidence custodian

12  went in -- I don't recall specifically what she was wearing

13  that day.  We do have FBI -- clothing that says FBI ERT, and I

14  -- I can make an assumption she was wearing it that day, but I

15  can't -- I don't specifically know.

16  Q    Agent Goeden, were you yourself wearing an identifier --

17  an FBI identifier?

18  A    I don't believe that I had my FBI raid jacket on, but I

19  had an FBI shirt on and then I have, obviously, my badge and

20  credentials.

21  Q    And is it typical that FBI agents who participate in

22  executions of search warrants do wear identifiers?

23  A    Yes.

24  Q    And would the identifiers be in the form of a shirt with

25  FBI or a jacket with FBI on it?

1  A    It could be either of those, and also a badge and

2  credentials.

3  Q    All right.  And would you say that that was so on March

4  26th when the FBI agents approached with APD officers, that

5  they all had identifiers of some sort?

6  A    They would have had some type of identifier.  As to

7  specifically what each individual -- individual was wearing, I

8  can't speak to that.

9  Q    All right.  Now, all of the FBI agents were armed that

10  day, is that right?

11  A    The agents, yes.

12  Q    All right.  And is it typical for agents who are bearing

13  firearms to make the firearms visible?

14  A    I'm not -- on entry?  I'm not sure what -- what your

15  question --

16  Q    On entry into an apartment?

17  A    When we are conducting a search warrant and we're -- if

18  I'm understanding your question correctly -- and we're

19  entering an apartment, to clear it, secure it, do a security

20  safety check, yes, it's -- it is typical that we would have

21  weapons out.

22  Q    Okay.  Now, at the time the agents entered Sidney

23  Greene's apartment, someone placed Sidney Greene in handcuffs,

24  is that right?

25  A    Yes.

1    Q     Was that Detective Barbosa?

2    A     I think so, but I don't -- I -- I can't say for sure.

3    Q     Now, in terms of your role at the execution of the search

4    warrant, you oversaw the search, is that right?

5    A     Correct.

6    Q     And you did some searching yourself?

7    A     Correct.

8    Q     And also, part of your job was to look at evidence that

9    other law enforcement officers brought to you so that you

10   could see if that evidence fit within the warrant?

11   A     Correct.

12   Q     And you would take out -- is it fair to say that you

13   would take out Attachment B and compare what the officers

14   brought you to see whether or not that item fit within the

15   warrant?

16   A     Sure.  There were some things that I -- I was very clear

17   on fit within the warrant, so I wouldn't pull the attachment

18   out, but if there was any question, I would absolutely pull

19   the attachment out.

20   Q     All right.  And so by the time the -- the warrants -- or

21   the items were taken from the apartment, the items had passed

22   through a scrutiny of the individual officer who found it and

23   also your scrutiny?

24   A     Yes.  I -- if the individual officer seizing the item did

25   not have a question about whether it fit within the warrant,

1   it may not come to me, but if there were things that were

2   questionable, they would come to either Detective Barbosa or

3   I.

4   Q    All right.

5   A    I can't say that I -- that every single item that was

6   seized was brought for me to look at and then went to the

7   evidence custodian.  I cannot say that that happened.

8   Q    What -- when you -- when you were scrutinizing what the

9   other agents and officers brought to you, did you also pull

10  out your list of victims who were associated with the sex

11  trafficking investigation?

12  A    I don't recall if I would have pulled out that list

13  because that list was also in my head.  I knew those people

14  because I had been working on this investigation, as did

15  Detective Barbosa, so I -- I can't say if I pulled out the

16  list or -- to review the list.

17  Q    All right.  Now, at some time, did you review the tax

18  documents that were in the black bag, the green bag, and also

19  elsewhere in the apartment?

20  A    Did I review them at --

21  Q    At the scene.

22  A    -- at the search site?  I -- I looked at them.  I would

23  not have scrutinized them.  I mean, I would not have gone page

24  by page and read everything on each page.

25  Q    I believe it was on direct exam that you said that you

1   had seized the tax documents pursuant to paragraphs A and B of

2   Attachment B?

3           MR. COOPER:  I'm going to object, Your Honor.  It --

4   the motion is to suppress the contents of a black bag and a

5   green bag, and now counsel is referring to tax documents.  So,

6   it's no longer clear.  Are we just now speaking of a subset of

7   the black bag and the green bag, or is tax documents being

8   used to speak generically to all contents of each or one of

9   those bags?

10          MS. DEUTSCH:  Your Honor, I'm speaking to tax

11  documents in the green bag, tax documents in the black bag,

12  and tax documents found elsewhere.

13          MR. COOPER:  Well, when -- once again, when you say

14  tax documents, are we talking about tax returns, are we

15  talking about -- I mean, it's -- I guess the objection is it's

16  vague because there's a lack of specificity by what Ms.

17  Deutsch means when she says tax documents.

18          THE COURT:  Well, I guess my question is what's the

19  relevance of questioning regarding tax documents found

20  elsewhere to this motion?

21          MS. DEUTSCH:  The relevance, Your Honor, is it's

22  beyond the scope of the warrant.  There was never an

23  investigation regarding tax fraud or any other violation of

24  the tax code by Mr. Greene.  The investigation involved sex

25  trafficking.  And the -- there were a lot of text -- tax

1    documents found after which developed the tax fraud

2    allegations and the superseding indictment -- or a second

3    superseding indictment.

4             THE COURT:  But this motion isn't dealing with tax

5    documents other than is found in the blue and the black and

6    green bags, right?

7             MS. DEUTSCH:  We -- Your Honor, we had talked about

8    it in our motion.  We had -- we -- we had contacted Leslie

9    Hiebert, Your Honor, during the course of our looking at the

10   motions, and we were -- we were trying to comply with Your

11   Honor's directives, and Leslie Hiebert had said that she -- it

12   had been her intent to include all tax documents, and so we --

13   I believe her -- her motion stated something about the black

14   bag, her memorandum stated something about both bags, and

15   other tax documents, and so that was our intent, that this

16   should include all tax documents.

17            THE COURT:  All right.  I just ask you to be as

18   specific as you can be in the questioning which ones you're

19   referring to.

20            MS. DEUTSCH:  Okay, Your Honor.

21   BY MS. DEUTSCH:

22   Q    All right.  Now, Agent Goeden, at the time officers

23   brought tax documents to you, whether from the green bag, the

24   black bag, or elsewhere in the apartment, did you look at the

25   names that were on the tax documents?

1    A     Yes, I would have looked at -- at some -- at the names.

2    Did I look at every specific name?  There were big stacks, I

3    flipped through them, so, yes.

4    Q     And did you look at the occupations asserted in the tax

5    documents?

6              MR. COOPER:  Your Honor, once again, I'm going to

7    object.  Perhaps -- as to vagueness.  Perhaps it's my old CPA

8    training, but a tax document can be a return, it can be a

9    document from an employer that would be used to enter

10   information on a return, it could be a notice from the IRS, it

11   could be a W-2 form, could be a W-4 form, it could be a Social

12   Security card, it could be any number of documents.  So, when

13   counsel says tax documents, it is -- it is very, very vague.

14   If she has specific documents either from Exhibit Number 3 or

15   5, then perhaps she could show the witness and say how does

16   this fall within, but the problem is once you ask a witness in

17   the universe of all things that could be tax reduced to paper,

18   did you look at them all?  It's really vague and overbroad.

19             THE COURT:  I'll sustain the objection.  If you can

20   -- if you have specific documents you want to inquire about or

21   -- or if you can describe the classification of documents that

22   you're inquiring about, that would be of assistance.

23             MS. DEUTSCH:  All right.  Maybe I should narrow it

24   down, Your Honor, with the Court's permission, to IRS

25   documents?  In other words, not Social Security documents, IRS

1    documents.

2            THE COURT:  Documents that were sent to them or came

3    from them or --

4            MS. DEUTSCH:  Like 1040 forms, that kind of thing.

5            THE COURT:  That would come from them.

6            MS. DEUTSCH:  That would have come from the IRS.

7            THE COURT:  Okay.  That's helpful then.

8            MS. DEUTSCH:  All right.

9    BY MS. DEUTSCH:

10   Q    Did you look at the -- the -- the professions or

11   employment described on the IRS documents that were presented

12   to you by other law enforcement officers?

13   A    I don't recall if I looked at those occupations that

14   particular day.  I glance -- I looked at the form, so I --

15   it's right there, so I assume I did, but I don't have a

16   specific recollection of doing that.

17   Q    All right.  Now, Agent Goeden, on direct exam, you stated

18   that you had seized the IR -- IRS or the tax documents

19   pursuant to paragraphs A -- A and paragraph B on Attachment B,

20   is that right?

21   A    Correct.

22   Q    All right.  Now, what in paragraph A of Attachment B

23   lists income tax forms or IRS forms as an item to be seized?

24   A    Paragraph A does not use those terms.

25   Q    All right.  What in paragraph B states items con --

1  connected to tax -- tax fraud or IRS forms?

2  A    It does not use those terms either.

3  Q    In fact, paragraph B refers to financial transactions

4  related to prostitution operations?

5  A    Yes.

6  Q    All right.  And the tax -- there is nothing in any of

7  these IRS documents that indicates that there is a

8  relationship to prostitution operations?

9  A    Not to prostitution operations; however, some of the

10  individuals are associated with the prostitution operation.

11  Q    Who is associated with the prostitution operations that

12  you knew of at the time of the execution of the search

13  warrant?

14  A    In which set of documents are you referring to?

15  Q    In any of the IRS documents.

16  A    It'll take me a moment to go through these.  Certainly

17  Sidney and Sabil.

18                    (Pause)

19  Can I clarify the question?

20         MS. DEUTSCH:  Your Honor, may Agent Goeden clarify

21  the question?

22         THE COURT:  Yes.

23         THE WITNESS:  Are you -- you speaking -- this is

24  another tax clarifying question -- specifically to the 1040's,

25  or are you also referring to the -- the other documents that

1    are with the 1040's?

2              MS. DEUTSCH:  I'm referring to only the -- the

3    documents issued from the Department of Revenue -- from the

4    IRS --

5              THE WITNESS:  Okay.  So, not --

6              MS. DEUTSCH:  -- such as --

7              THE WITNESS:  -- not the handwritten notes that are

8    with --

9              MS. DEUTSCH:  Correct.

10             THE WITNESS:  -- everything.  Okay.

11                            (Pause)

12   I don't want to use individuals' names, so I'm not sure how

13   you want me to respond to this.

14             MS. DEUTSCH:  Your Honor, would -- can Agent Goeden

15   use the initials?

16             THE COURT:  Yes, you may use initials.

17             THE WITNESS:  Okay.

18   A    This is a tax return with the initials Q.C.  This was an

19   individual that -- this is an individual that I know to be

20   associated with the investigation.  As to if I knew on that

21   particular day, I don't recall.

22   BY MS. DEUTSCH:

23   Q    And --

24   A    I believe we -- I knew of her, but I -- I don't recall

25   specifically.

1  Q    Agent Goeden, do you have any documents generated during

2  the course of the investigation that would refresh your memory

3  whether you knew of Q.C. prior to March 26th, 2009?

4  A    I'm sure that I do, but I don't have them here.  I mean,

5  I don't have my case file here, so I can't speak -- I can't

6  say right now.

7  Q    Okay.  Agent Goeden, is Q.C. listed in the search warrant

8  as a victim, a recruiter, an associate, a CI, or anyone else

9  associated with the prostitution business?

10 A    I do not believe that Q.C. is referenced -- is in the

11 affidavit.

12 Q    All right.  Now, besides Q.C., are there any other

13 persons that you recognize -- or recognized on March 26th --

14 A    Yes.

15 Q    -- as being associated with the sex trafficking?

16 A    There was 1040 with the initials G.N., and I am familiar

17 with that name and I was familiar on that day with that

18 individual.

19 Q    And do you have a specific recollection that you saw that

20 -- that IRS document on March 26th and recognized that name to

21 be a name in the sex trafficking investigation?

22 A    A specific recollection that I -- I saw that name.  I --

23 I saw that name -- I -- yes, I do, actually, because that --

24 yes, I do, for that particular name -- for G.N.  And there are

25 a couple in here for G.N.  I won't go over each individual

1  one, but there are -- there's at least two that I passed, and

2  then another one for Mr. Mujahid.

3                          (Pause)

4  There's also a tax document for a male with the initials L.B.

5  that I was aware of.

6  Q    Now, Agent Goeden, in your Attachment A, affidavit to the

7  search warrant, you discuss various situations involving

8  individuals related to the sex trafficking operation or the

9  investigation?

10  A    Yes.

11  Q    And in that affidavit, you do not mention Q.C., is that

12  right?

13  A    No, I don't believe Q.C. is referenced in here.

14  Q    And you also did not mention G.N. in that document, did

15  you?

16  A    G.N., no, I do not believe she's referenced specifically

17  in here.

18  Q    And you did not reference L.B. either, is that right?

19  A    No, I believe L.B. is in here.  Just give me a moment and

20  I can show you where.

21                          (Pause)

22  I believe L.B. is referenced in here as a recruiter.

23                          (Pause)

24  Okay.  I'm not seeing recruiter, however, recruiter is

25  mentioned in the attachment, I believe.  And I apologize.

1    There have been numerous search warrants on this.  Just give

2    me a moment.

3                            (Pause)

4    Yeah.  Attachment B refers to recruiter one and recruiter two,

5    and L.B. is one of those recruiters, and I'm just trying to

6    find it within the affidavit now.

7                            (Pause)

8                MR. COOPER:  May I assist, Your Honor?

9                THE COURT:  Yes.

10               MR. COOPER:  Paragraph 30.

11               THE WITNESS:  Thank you.  Yes.  Thank you.

12   Paragraph 30, recruiter one is L.B.

13   BY MS. DEUTSCH:

14   Q    When did you first encounter recruiter one or mention of

15   recruiter one in your investigation?

16               MR. COOPER:  Objection, Your Honor.  Relevance.  I

17   know that counsel wants to get through this, but how that

18   refers or would support the motion to suppress is just not

19   clear at all.

20               THE COURT:  What's the relevance?

21               MS. DEUTSCH:  The relevance, Your Honor, again, is

22   that at the time of the investigation, the officers were

23   investigating Mr. Greene for sex trafficking and the Travel

24   Act -- violations of the Travel Act, not for violations of the

25   tax code or for income tax fraud or anything like that.  So, I

1    think when Agent Goeden learned of recruiter one or Q.C. or --

2    or G.N. is very relevant.

3              THE COURT:  Well, she's testified that this

4    individual is known to her as a recruiter.  What's the

5    relevance of how long that person was known as a recruiter?

6              MS. DEUTSCH:  Well, had -- did Agent Goeden know of

7    the recruiter prior to -- well, let me withdraw that, Your

8    Honor --

9              THE COURT:  Okay.

10             MS. DEUTSCH:  -- okay?  I will withdraw that.

11   BY MS. DEUTSCH:

12   Q    Agent Goeden, in the -- at the time that you wrote up

13   Attachment B with Detective Barbosa, you had made no mention

14   of the fact that you were looking for tax documents or

15   anything related to tax fraud, is that right?

16             MR. COOPER:  I'm going to -- I'm going to object,

17   Your Honor.  The Government will stipulate that at the time

18   this search warrant was applied for, granted, and executed,

19   the tax investigation was not called out in the search

20   warrant, so that the narrow focus of this inquiry should be

21   whether or not the documents that were seized in the green

22   bag, black bag, or even, quote, "tax documents," close quote,

23   otherwise, fall within -- regardless of whether they might

24   later be used in some -- in support of charges related to a

25   tax scam or identity theft or what have you -- whether or not

1   these precise documents fall within any of the enumerated

2   items to be seized as set forth in Attachment B and as

3   supported in Attachment A, the affidavit.

4          So, it's -- it's kind of a red herring that's being

5   drug out here that it's -- it's some kind of a -- somehow it's

6   impermissible to seize a document that might later be used in

7   a subsequent investigation concerning additional charges that

8   might go on.  The sole issue before the Court is whether, as

9   Mr. McCoy put it when he argued quite eloquently the 304

10  motion, do they fall within any of these enumerated paragraphs

11  in either Attachment B, and are they adequately supported by

12  Attachment A?

13         So, we're -- we're -- for the purposes of arguing

14  this motion and for the Court deciding this motion, the

15  Government will stipulate that at the time this warrant was

16  applied for and executed and returned, the tax charges

17  starting at I think count thirty of the Indictment, I'd have

18  to look at it, and -- and -- and thereafter were not

19  contemplated and they were not called out.

20         The Court recalls that the search warrant calls out

21  Travel Act, prostitution enterprise, racketeering.  Thank you.

22         THE COURT:  Ms. Deutsch, do you want to accept that

23  stipulation?

24         MS. DEUTSCH:  Of course.

25         THE COURT:  Okay.

1          MS. DEUTSCH:  Okay.

2          THE COURT:  Then that will be on the record.  You

3    can proceed.

4          MS. DEUTSCH:  All right.

5    BY MS. DEUTSCH:

6    Q    Agent Goeden, when the -- the agents or the officers

7    brought these tax documents to you, did you give the go-ahead

8    for them to seize them and take them out of the apartment?

9    A    Yes.

10   Q    And at that time, had you gone through each and every one

11   of the IRS documents?

12   A    I did not go through each and every piece of paper --

13   Q    All right.  Did --

14   A    -- that was handed to me.

15   Q    Did you question the officers who brought these documents

16   to you as to the names on the IRS documents?

17   A    I recall some discussions when documents were brought to

18   me.  I guess specifically the tax documents as well -- you

19   know, tax documents, and that they include tax documents for

20   Sabil or for Sidney and that kind of thing, and then I flipped

21   back through them and looked through them further.  I don't

22   recall specific conversations with the individuals who brought

23   them to me about specific names on them beyond that kind of

24   discussion.

25         MS. DEUTSCH:  No further questions, Your Honor.

1    THE COURT:  Any redirect?

2    MR. COOPER:  Yes, Your Honor, if I may.

3                **REDIRECT EXAMINATION**

4    BY MR. COOPER:

5    Q    Special Agent Goeden, turning your attention towards, I

6    believe, Exhibit Number 5, would you page down through there,

7    the third page -- I think it's at number 520 -- 520 to 521.

8    A    Yes.

9    Q    Do you recognize the name on that document from the IRS?

10   A    I do.

11   Q    Is that a person who was a known associate of Mr. Greene

12   at the time?

13   A    Yes, it was.

14   Q    Is she the mother of some of his children?

15   A    Yes.

16   Q    All right.  Turning your attention now to 522 <u>et. seq.</u>

17   It's going to go through about 527.  Could you describe that

18   generally to the Court?

19   A    This is a hand rot -- handwritten document.  It's

20   entitled "Business Plans to Alaska Communication Systems," and

21   the second page is a resume for Sabil Mujahid.

22   Q    And are pages two -- two and three -- that is, page 524

23   and 525 -- does that appear to be an index to this business

24   plan?

25   A    It does.

1  Q    Turning your attention down to tab "I" on page 525, do

2  you recognize that name?

3  A    I do.  I also recognize the name in tabs -- tab K.

4  Q    I'm sorry?

5  A    I also recognize the name listed next to tab K.  Both of

6  those names.

7  Q    Okay.  And both of -- and is -- is tab "I", is that Q.C.

8  of whom you spoke earlier?

9  A    It is.

10 Q    All right.  So, here's a document that has Q.C. as a

11 known associate of Mujahid, correct?

12 A    Correct.

13 Q    In fact, whose name appears for tab G?

14 A    Mr. Mujahid's.

15 Q    All right.  Now, this investigation of which you've been

16 speaking and testifying here today, in the course of the

17 investigation, were computers seized from both Mr. Mujahid and

18 Mr. Greene?

19 A    Yes, they were.

20 Q    Have those computers been reviewed forensically?

21 A    Yes, they have.

22 Q    How many photographs of young women appear on those

23 computers?

24      MS. DEUTSCH:  Can -- Your Honor, objection.  Can we

25 be more specific as to which computer?

1      MR. COOPER:  The computers seized pursuant to the

2  search as executed at Mr. Mujahid's apartment, 2405 East 5th,

3  and Mr. Greene's apartment at 900 South Klevin, Number 1.

4      THE COURT:  Perhaps you can take them one at a time.

5  BY MR. COOPER:

6  Q   Again, I'm asking for just like general numbers, but

7  let's take Mr. Mujahid's -- the computer seized from Mr.

8  Mujahid's apartment, okay?

9      MS. DEUTSCH:  Your Honor, I'm still objecting.  What

10  is the relevance of the photographs?

11      MR. COOPER:  Sure.  Let me make an offer of where

12  I'm going with this, Your Honor.

13      THE COURT:  Okay.

14      MR. COOPER:  What I'm attempting to establish

15  through the testimony of this witness is that in the course of

16  this investigation, which she has testified is ongoing, that

17  there are literally dozens of women and men associates of

18  Mujahid's and Greene's that have been recovered from their --

19  the searches of their computers, the searches of their home,

20  and that many of them remain unidentified.

21      MS. DEUTSCH:  Objection, Your Honor, as to

22  relevancy.  At the time of the execution of the search

23  warrant, the computers hadn't been searched, so it doesn't

24  matter whether or not there were photos that were identified

25  or unidentified on the computers.

1          MR. COOPER:  Well, the whole issue goes to the

2    cross-examination with respect to the number of victims and

3    witnesses that were known and unknown, and the clarity of and

4    the ability of this agent to recall them all, and I was just

5    attempting to establish that there are dozens, many of whom

6    remain unidentified.  If -- if --

7          THE COURT:  If you want to limit your question to at

8    the time of the search, that would be fine.  I know it

9    wouldn't be relevant --

10          MR. COOPER:  Okay.  What if we approach --

11          THE COURT:  -- regarding the computers --

12          MR. COOPER:  Sure.

13          THE COURT:  -- but --

14          MR. COOPER:  Let me approach it a slightly different

15   way.

16   BY MR. COOPER:

17   Q    Special Agent Goeden, in the course of this

18   investigation, were APD officers and FBI special agents

19   monitoring postings on Craig's List here in Anchorage, Alaska?

20   A    Yes, we were.

21   Q    And as part of those postings, were there photographs of

22   young women and sometimes men?

23   A    Yes.

24   Q    Was there a way to associate photographs to either Mr.

25   Mujahid or to Mr. Greene?

1    A    At times, yes, but at times no.

2    Q    For instance, could you use the telephone number that was

3    posted in the ad to --

4    A    Yes.

5    Q    And how many -- prior to the time -- and we're just

6    talking ball park estimates here.  Prior to the time of the

7    execution of this warrant on March 26th of 2009, how many

8    photographs on Craig's List postings associated with Mr.

9    Mujahid and Mr. Greene did you think you reviewed?

10   A    I reviewed all of the Craig's List postings that we had

11   associated to them.  As to numbers, it's a binder full, so --

12   and there certainly are duplicates within that binder, but

13   there are thirty approximately, and that might be a

14   conservative estimate -- forty.

15   Q    So, a binder of about three or four inches thick?

16   A    Yes.

17   Q    All right.  Have you, as of the time that you executed

18   this warrant, been able to identify all of the -- the women

19   who were -- and men who were posted in those Craig's List

20   postings?

21   A    No.

22   Q    Do you have any idea how many were unidentified at the

23   time?

24   A    The number of individuals specifically in those Craig's

25   List postings that were not identified at that time, I can't

1    put a number to that, I'm sorry.

2    Q    All right.  That's fine.  Now, I want to go back to --

3    just a little bit about your training and experience.  You

4    said you've been an FBI agent for seven years.  Prior to

5    working for the FBI, what kind of work did you do?

6    A    I was a therapist -- the job just previous to the FBI was

7    a therapist for the Department of Corrections in Minnesota.

8    Q    What kind of patients were you providing therapy to,

9    other than the category prisoners?

10   A    Sure.  Through the Department of Corrections and then

11   also in my job prior to that, I was doing therapy for sex

12   offenders.

13   Q    During the course of your employment with the FBI, have

14   you developed any particular expertise or area in which you

15   conduct most of your investigations?

16   A    Yes.

17   Q    Could you tell the Court what that is, please?

18   A    Most of my investigations are in the area of sex

19   trafficking and human trafficking.

20   Q    Do you also investigate child exploitation cases?

21   A    I do.  And it -- within the context of that, we call them

22   innocence lost cases, but those are child exploitation cases.

23   Q    Have you had specialized training, in addition to your

24   training as a therapist, in the means and methods used by

25   persons who prostitute others and traffic others in -- in

1  controlling their victims, their prostitutes?

2  A    Yes.

3  Q    Is it common in your experience for women and men and

4  children who have been prostituted to at times try to escape

5  from -- from -- I'm going to call that person their pimp.

6       MS. DEUTSCH:  Objection to the relevance, Your

7  Honor, of all these questions.

8       THE COURT:  What's the relevance?

9       MR. COOPER:  Oh, the relevance is -- is -- really

10  goes to supporting the statements and averments made in -- in

11  the application for the warrant, and also goes to whether or

12  not the documents that are reviewed by Ms. Goeden -- Special

13  Agent Goeden -- were properly seized pursuant to the warrant.

14       THE COURT:  What's the connection between the

15  documents and whether or not people try to escape?

16       MR. COOPER:  Well, that's -- that's the next

17  question, which is do they leave?  Yes, I -- I assume is what

18  she's going to say based upon what I know of her and her

19  training and experience, and that often these -- these folks

20  leave documents behind.

21       THE COURT:  Overruled.

22  BY MR. COOPER:

23  Q    Okay.  So, the question -- pending question, I -- I

24  believe, is do people try to escape what I'm -- what I'm going

25  to call a pimp or a person who prostitutes or traffics others?

1   A      Yes.

2   Q      Do they leave things behind?

3   A      Oftentimes, yes.

4   Q      Could you tell the Court why they do that and what they

5   do -- what -- what kind of things they often leave behind?

6   A      The types of things that are often left behind include

7   everything from clothing, personal objects like clothing or --

8   or jewelry, cell phones, documents, identification cards,

9   birth certificates, a number of things like that, and the

10  reason, from my experience, why they're often left behind is

11  because many of the young women leave quickly, they don't take

12  time to pack, they just -- they try to get out of the

13  situation and they leave their items.

14          MR. COOPER:  I have nothing further, Your Honor.

15          THE COURT:  Thank you.  Okay.  Are we -- would you

16  like to argue?

17          MS. DEUTSCH:  Briefly.

18          THE COURT:  You can step down.  Thank you.

19              **DEFENDANT'S CLOSING ARGUMENT**

20          MS. DEUTSCH:  Your Honor, this, briefly, was an

21  eight-month investigation, and it involved a team of

22  investigators from FBI and APD, and what they were

23  investigating was violations of the traffic -- of the Travel

24  Act and also sex trafficking in regard to Mr. Greene.

25              Agent Goeden testified that at the time of the

1  briefing just prior to the execution of the search -- search

2  warrant, she was involved in pretty much leading the team of

3  investigators who were to execute the search warrant.  As

4  such, she read the majority of Attachment B, she summarized

5  Attachment A, she handed out Attachment B plus a list of those

6  victims whom she believed were victims of the prostitution

7  ring or sex trafficking on the part of Mr. Mujahid and Mr.

8  Greene.

9          So, at the time the officers and agents arrived at

10  900 Klevin Street, most or many of them or some of them had

11  Attachment B with them as well as lists of names of the

12  victims.  The purpose of that was to compare those items found

13  that they were searching for against the list of the victims'

14  names and against those items in Attachment B.

15         Your Honor, it's our position that at the time the

16  execution of the search warrant was done, that the agents

17  didn't have any idea that Mr. Greene was involved in any kind

18  of a tax fraud or IRS fraud endeavor, and that they just

19  seized documents willy nilly.

20         There were an awful lot of documents in Government's

21  exhibits from the green bag and from the black bag, as well as

22  there were documents in different parts of the apartment.

23  Although Agent Goeden testified that there were three names on

24  the IRS documents that she has associated with sex

25  trafficking, it's very difficult to know whether or not on

1   March 26th, Agent Goeden or any of the other officers

2   recognized those names as part of the sex trafficking.  There

3   are numerous documents associated with the -- the IRS

4   documents, Your Honor, and it's hard to believe that all of

5   the officers who were looking at all of these documents went

6   through them very carefully and checked those names against

7   the list of the victims.

8           It's our position, Your Honor, that the -- the

9   seizure of those documents is outside the scope of Attachment

10  A and Attachment B to the search warrants.  Those attachments

11  talk about financial documents associated with sex

12  trafficking.  It says nothing about tax fraud or any other

13  kinds of -- of crime.

14          Your Honor, we would ask you to seize -- or excuse

15  me -- to suppress those documents as outside the scope of the

16  warrant, as well as any mention of those documents at the time

17  of trial.

18          In terms of the seizure of the call and also the

19  suppression of the statements, I would submit, Your Honor, on

20  the evidence adduced.

21          THE COURT:  Okay.  Thank you.

22          MS. DEUTSCH:  Thank you, Your Honor.

23          THE COURT:  Thank you.  Mr. Cooper?

24                  **GOVERNMENT'S CLOSING ARGUMENT**

25          MR. COOPER:  Thank you, Your Honor.  Well, the Court

1    has before it essentially the third evidentiary hearing on

2    this same warrant, the four -- the same forty-eight warrant.

3    Initially, there was a hearing at which Judge Burgess issued

4    an order with respect to overbreadth and the child

5    pornography.

6         The second warrant was the -- excuse me, the second

7    motion was filed at 304 by Mr. Mujahid, wherein he asserted

8    that the black bag was his, and so that he had standing in

9    order to seek suppression of that, and that motion is still

10   pending.  Evidentiarily (ph) in this hearing, Mr. Greene has

11   not been heard from to say the black bag is Mr. Mujahid or the

12   black bag is mine.

13        So for the purposes, I would submit, of this

14   particular proceeding, the Court is left with an evidentiary

15   void, and has basically got to assume since it was found at

16   900 Klevin, it's Mr. -- it's Mr. Greene's.  That's the only

17   way he has standing.

18        But the Court at some point is -- is going to have

19   to resolve the issue of whose property is that black bag and

20   who has standing to -- to -- to -- to seek its suppression.

21   For one -- on the one hand, if Greene says, hey, it's like

22   mine, then Mr. Mujahid is kind of up the creek without a

23   paddle, but if he says, no, it's Mr. Mujahid's, then Greene

24   has no standing here to assert -- he has no expectation of

25   privacy in this black bag.  And so, we are caught, as it were,

1    on the horns of a dilemma, which I will leave to the Court's

2    hands.

3         But the motion before the Court seeks to suppress

4    what counsel has denominated tax documents, and when one steps

5    back and looks at the motion first, they say I want to

6    suppress all the contents of the black bag, I want to suppress

7    all the contents of the green bag, and then I want to suppress

8    all tax documents received.  And I would submit to the Court,

9    unfortunately, that the Court's going to have to look at these

10   documents and make a call.

11        But the Court has, once again, a lack of evidence

12   with respect to other tax documents.  The Court has no

13   evidence before it about what documents they're talking about.

14   So, if we take -- and -- and -- and -- and I suggest that the

15   Court should interpret most broadly their motion to expand

16   filed, I think, at Docket 531 because in their -- they do use

17   the phrase "other tax documents."  The Court still has nothing

18   on which to rule because the Court can't say I'm going to

19   exclude all tax documents seized from 900 Klevin Street

20   without knowing what they are.

21        So, Mr. Greene has failed in his burden of proving

22   anything with respect to whatever else it is he seeks, and the

23   Government has been deprived of its opportunity to argue with

24   specificity about that evidence.

25        So, here, what they seem -- what -- what Mr. Greene

1    seems to be saying is in Exhibit Number 4 -- and I want to

2    make sure my record is correct.  It's Exhibit Number 4 and

3    Exhibit Number 5, there exist documents that are tax documents

4    that are properly suppressed because they can't be found

5    within the four corners of the affidavit and Attachment B.

6    And I would submit to the Court that what the Court should do

7    is look at what is set out and called out in Attachment B, and

8    the reasons that they are requested which are found in

9    Attachment A, the affidavit.

10           And I will draw the Court's attention to -- in the

11   affidavit, page twelve of sixteen, and thirteen of sixteen --

12   excuse me -- and then continuing on actually through fourteen

13   of sixteen.  Paragraph one lays the probable cause for -- for

14   search -- excuse me -- for searching for and seizing the items

15   enumerated in paragraph three, which forms the -- and informs

16   Attachment B.

17           And here, we're looking for financial documents that

18   would tend to support -- prove relationships between Mujahid

19   and Greene and others dealing with the prostitution

20   enterprise.  And the difficulty, as the Court knows, is when

21   one looks at a document -- let's take Government Exhibit

22   Number 5 at 518 and 519, the first two pages, is the tax

23   return of Sidney Greene.  Now, that tax return says he's got

24   business income in a certain amount, and it said from a

25   janitorial and cleaning service.  He is reporting to the

1   Internal Revenue Service for the year 2007 that this is what

2   his -- his income is.

3           Does that tend to prove or disprove prostitution?

4   Well, in his view, it tends to show that he's saying, at least

5   to the Government and one agency, I am a law-abiding citizen,

6   when the Government is investigating something else.  Should

7   the Court find that to be within paragraph one or paragraph

8   two of Attachment B?  The Court has to make that call.

9           The next is a refund -- or excuse me, not a refund,

10  it's a notice of audit with respect to one of his wives.  Then

11  you get down and then there's nothing there until you get to

12  some copies of Internal Revenue Service treasury text --

13  checks, excuse me, and they do have some Social Security

14  numbers on them that are -- and the name is blanked out.  The

15  investigators are entitled to seize those to go see whose

16  Social Security numbers those are.  Are they related to any of

17  the individuals that are known?  Because they're not provided

18  with them, but they've got -- here's a document that is from

19  the Internal Revenue Service, it's found in Mr. -- Mr.

20  Greene's bag, it's got Mr. Greene's tax return on the top.

21  Who's got those Social Security numbers?  Who -- to whom did

22  they relate?  And we can't always know the names of everyone,

23  but it's persons that are related to it, or possibly related

24  to it, within the scope of those -- those paragraphs.

25          I think that when the Court looks fairly at the

1    documents that are in these two exhibits, four and five,

2    applies the law that's really there with respect to search and

3    seizure, and then whether or not they -- they meet the

4    requirements of -- of Attachment B and Attachment A, the

5    affidavit, the Court can make its ruling about whether or not

6    they're properly seized, and if not, it should enter an order,

7    as it did with respect to the first warrant, saying these

8    specific documents I find are not within the four corners of

9    the warrant and I order them be returned, and we will comply

10   immediately.

11            With respect to the call motion, Your Honor, the

12   evidence is clear that Mr. Greene was for a time handcuffed,

13   but at the same time, he was clearly advised and there's --

14   Mr. Greene has not testified otherwise -- there's no affidavit

15   or motion before the Court, declaration by Mr. Greene that he

16   was not properly advised that he was free to leave.  He could

17   go anywhere he wanted, but if he was going to stay, he was

18   going to stay pursuant to the conditions that Special Agent

19   Goeden testified to.

20            So, he had the opportunity to leave, he made the

21   choice.  At some time after everybody felt comfortable with

22   what was going on, offer -- officer safety was no longer an

23   issue, he was unhandcuffed.  As -- as both Detective Adair and

24   Special Agent Goeden testified, he was free to go to the

25   bathroom, he came back, and as Special Agent Goeden testified

1  in her affidavit, which was -- which was filed in support of

2  our opposition at 330, he was in fact cooking dinner for the

3  children.

4         So, the Court's going to make a determination --

5  it's also very clear that he was never Mirandized, and the law

6  is set forth in the briefing from both parties, but the

7  Government submits that he made a choice to stay voluntarily,

8  he was advised of the conditions of that, he was restrained,

9  but moreover, he was still making spontaneous statements un --

10  unsolicited by the officer, and all those statements should be

11  admitted.  Thank you very much.

12         THE COURT:  Thank you.  Thank you very much to the

13  parties.  Ms. Deutsch, Ms. Sullivan, welcome.

14         MS. DEUTSCH:  Thank you, Your Honor.

15         THE COURT:  I think this is the first hearing I've

16  had with you both.  I'll take this under advisement, and

17  remind me when the trial date is?

18         MR. COOPER:  In this case, Your Honor, it is October

19  11th of this year.

20         THE COURT:  Okay.  So novel not to be in a rush.  I

21  can't imagine --

22         MR. COOPER:  Well, I know the Court has in another

23  case, the companion -- well, not the companion case, the

24  ninety-one case before Judge Holland, we're under some

25  deadlines there, so --

1          THE COURT:  Yeah.

2          MR. COOPER:  And may I submit these exhibits to the

3 Court?

4          THE COURT:  I definitely want copies of all the

5 exhibits.  I do prefer not to have originals --

6          MR. COOPER:  Okay.

7          THE COURT:  -- so if you consider those to be

8 copies, great, show them to me.  But as I say, any originals,

9 I ask that the parties keep those.

10         THE CLERK:  Your Honor, can I confer about exhibit

11 -- Plaintiff's Exhibit -- I'm sorry -- five?  That was not

12 admitted.  It was identified.

13         MR. COOPER:  Oh, I apologize, Your Honor.  The

14 Government moves the admission of five.  And I don't know if

15 they want Defendant A's which is the search warrant to go in

16 or not.

17         MS. DEUTSCH:  You can submit that.  We have copies.

18         MR. COOPER:  Oh, I -- the Government --

19         THE COURT:  It might as well be included if it

20 was --

21         MR. COOPER:  Okay.

22         THE COURT:  -- listed as an exhibit.

23     (Defendant's Exhibit A admitted)

24         MR. COOPER:  So, we'd move the admission of five,

25 Your Honor.

1          THE COURT:  And what is five?

2          MR. COOPER:  Five is the contents of the green bag.

3          THE COURT:  Oh, okay.  Any objection?

4          MS. DEUTSCH:  No, Your Honor.

5          THE COURT:  Okay.  Five will be admitted.  And

6  here's one.

7       (Government's Exhibit 5 admitted)

8          MR. COOPER:  Thank you, Your Honor.

9          THE COURT:  Are those copies you have or will you be

10  dropping copies off at my chambers?

11          MR. COOPER:  Well, I -- what I'll do is I'll have my

12  staff make copies that have the exhibit stickers on them.

13          THE COURT:  Okay, great.  Okay.  Thank you.  Court

14  will stand in recess.

15          THE CLERK:  All rise.  This Court now stands

16  adjourned subject to call.

17       (Proceedings concluded at 11:33 a.m.)

18

19

20

21

22

23

24

25

```
1                              INDEX

2                                                        Further
                    Direct   Cross   Redirect   Recross  Redirect
3
  WITNESSES FOR THE
4  GOVERNMENT:

5  Randy Allen Adair    5        19        41

6  Jolene Goeden       43        62        86

7

8  EXHIBITS:                              Marked    Received

9  GOVERNMENT:

10 1    Photograph                                        8
   2    Photographs (5)                                   16
11 3    Photographs (3)                          55       57
   4    Contents of black bag                    56       57
12 5    Contents of green bag                    58      103

13 DEFENDANT:

14 A    Search warrant application                       102

15

16                                                      Page

17 DEFENDANT'S CLOSING ARGUMENT:  Ms. Deutsch            93

18 GOVERNMENT'S CLOSING ARGUMENT:  Mr. Cooper            95
```

1                          **CERTIFICATE**

2      I certify that the foregoing is a correct transcript from the
       electronic sound recording of the proceedings in the above-
3      entitled matter.

4

5        /s/ D. Kathleen Stegmiller                    04/26/2011
       D. Kathleen Stegmiller, Transcriber                Date

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25